KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
MATAN SHACHAM - # 262348
mshacham@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
MAXWELL E. ALDERMAN - # 318548
malderman@keker.com
SPENCER MCMANUS - # 322824
smcmanus@keker.com
ROBYN PARISER - # 335017
rpariser@keker.com
JONHATAN A. ARAGON - # 338756
jaragon@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant LINKEDIN CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| J.S.,<br><br>Plaintiff,<br><br>v.<br><br>SPRING FERTILITY HOLDINGS, LLC, et al.,<br><br>Defendants. | Case No. 5:24-cv-07374-EJD<br><br>**DEFENDANT LINKEDIN CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: April 3, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 4, 5th Floor<br>Judge: Hon. Edward J. Davila<br><br>Date Filed: October 22, 2024<br><br>Trial Date: None Set |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................................1

II. BACKGROUND ....................................................................................................4

A. LinkedIn provides its advertising partners with tools to run marketing campaigns, including through the Insight Tag. ....................................................4

B. LinkedIn requires advertisers to comply with the LinkedIn Ads Agreement, which prohibits advertisers from transmitting sensitive data to LinkedIn. ..............5

C. Both LinkedIn's and Spring's terms disclose the use and operation of the Insight Tag. ....................................................................................................5

1. LinkedIn discloses to users that advertising partners may collect, use, and share user data with LinkedIn through pixel trackers. ....................5

2. Spring's Legal & Terms discloses that Spring collects and shares user data with third parties for advertising purposes. .................................7

D. Plaintiff ignores these disclosures and tethers her privacy claims to threadbare allegations. ....................................................................................9

III. ARGUMENT ....................................................................................................10

A. Plaintiff's entire action fails because Spring and LinkedIn disclosed and obtained her consent to collect and share her user information. ............................10

B. Plaintiff's entire action fails because LinkedIn prohibited Spring from transferring health data via the Insight Tag and thus lacked the requisite intent to invade her privacy. ....................................................................................13

C. Plaintiff fails to state a CIPA claim under Section 631 because the party exception applies, and she otherwise fails to plead the elements of either a Section 631 or 632 claim. ....................................................................................15

1. LinkedIn is exempt from Section 631 under the "party exception" rule. ....................................................................................................15

2. Plaintiff cannot state a Section 631 claim under any of its three clauses. ....................................................................................................17

a. Plaintiff does not allege a wiretapping claim under the first clause of Section 631 because it does not apply to Internet communications. ....................................................................................17

b. Plaintiff does not allege a claim under the second clause of Section 631 because she does not adequately allege an interception of contents of communications while in transit. ........18

c. Plaintiff does not allege a claim under the third clause of Section 631 because it is derivative and fails for the same reasons as her claims under clauses one and two. .........................19

3. Plaintiff cannot state a Section 632 claim. 19

a. Plaintiff's Section 632 claim fails because she does not adequately allege that her communications were confidential. 19

b. Plaintiff's Section 632 claim fails because she does not plausibly plead that LinkedIn used an electronic amplifying or recording device. 20

D. Plaintiff fails to plead a Federal Wiretap Act claim. 21

E. Plaintiff fails to state a claim for invasion of privacy under the California Constitution. 21

IV. CONCLUSION 24

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ....................19

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ....................3, 19

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) .................... *passim*

*Doe I v. Google LLC*,
— F. Supp. 3d —–, 2024 WL 3490744 (N.D. Cal. Jul. 22, 2024) .................... *passim*

*Doe v. Microsoft Corp.*,
2023 WL 8780879 (W.D. Wash. Dec. 19, 2023) ....................20

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................21

*Flores-Figueroa v. United States*,
556 U.S. 646 (2009)....................13

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) ....................11, 12

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................12, 17, 19

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ....................3, 20

*In re Google, Inc. Privacy Policy Litig.*,
58 F. Supp. 3d 968 (N.D. Cal. 2014) ....................23

*Graham v. Noom*,
533 F. Supp. 3d 832 (N.D. Cal. 2021) ....................15

*Hammerling v. Google LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024).................... *passim*

*In re iPhone App. Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................13, 23

*James v. Allstate Ins. Co.*,
2023 WL 8879246 (N.D. Cal. Dec. 22, 2023)....................2, 3

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ....................18, 21

*Love v. Ladder Fin., Inc.*,
2024 WL 2104497 (N.D. Cal. May 8, 2024) .....3

*Moreno v. S.F. Bay Area Rapid Transit Dist.*,
2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) .....20

*Pyankovska v. Abid*,
65 F.4th 1067 (9th Cir. 2023) .....3, 21

*Quigley v. Yelp, Inc.*,
2018 WL 7204066 (N.D. Cal. Jan. 22, 2018) .....18

*Rodriguez v. Ford Motor Co.*,
722 F. Supp. 3d 1104 (S.D. Cal. 2024) .....16

*Rodriguez v. Google LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022) .....18

*Roe v. Amgen Inc.*,
2024 WL 2873482 (C.D. Cal. June 5, 2024) .....21

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .....2, 11, 12

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .....23

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ..... *passim*

*St. Aubin v. Carbon Health Techns., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) .....17

*Swarts v. Home Depot, Inc.*,
689 F. Supp. 3d 732 (N.D. Cal. 2023) .....3, 16, 19

*Turner v. Nuance Commc'ns, Inc.*,
2024 WL 2750017 (N.D. Cal. May 28, 2024) .....17

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .....12, 13

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) .....17

*Williams v. DDRMedia LLC*,
2023 WL 5352896 (N.D. Cal. Aug. 18, 2023) .....15, 16

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) .....21

*Yockey v. Salesforce, Inc.*,
688 F. Supp. 3d 962 (N.D. Cal. 2023) ....................17

**State Cases**

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) ....................21

*Hill v. Nat'l Collegiate Athletic Ass'n*,
865 P.2d 633 (Cal. 1994) ....................22

*People v. Ratekin*,
212 Cal. App. 3d 1165 (1989) ....................20

*Rogers v. Ulrich*,
52 Cal. App. 3d 894 (1975) ....................15

*Stark v. Super. Ct.*,
52 Cal. 4th 368 (2011) ....................13

**Federal Statutes**

18 U.S.C. § 2511 ....................10, 20

**State Statutes**

Cal. Pen. Code §§ 631, 632.................... *passim*

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................1

Federal Rule of Civil Procedure 9(b) ....................15

**LINKEDIN'S NOTICE OF MOTION AND MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 3, 2025, or as soon thereafter as this matter may be heard before the Honorable Edward J. Davila, in Courtroom 4 of the Robert F. Peckham Federal Building and United States Courthouse, located at 280 South First Street, San Jose, California 95113, Defendant LinkedIn Corporation ("LinkedIn") will and hereby does move to dismiss the complaint ("Complaint") filed by Plaintiff J.S. ("Plaintiff") in its entirety and with prejudice for failure to state a claim against LinkedIn under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This motion is based on this Notice of Motion, the following memorandum of points and authorities, LinkedIn's concurrently filed request for judicial notice and the supporting declaration of Max Alderman ("Alderman Declaration" or "Alderman Dec.") and the exhibits attached thereto, all pleadings and papers on file or to be filed in this action, counsels' arguments, and any other matters properly before the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

"This is another pixel case." *Doe I v. Google LLC*, — F. Supp. 3d ––, 2024 WL 3490744, at *1 (N.D. Cal. Jul. 22, 2024). Plaintiff pseudonymously brings a putative class action complaint against professional network provider LinkedIn in an attempt to capitalize on the latest wave of cases that seek to apply California's Constitution and the federal and state criminal privacy laws to online service providers and marketers. Plaintiff's case follows a standard blueprint—she alleges that her "health care provider[]" (Spring) "use[d] [LinkedIn's] source code" (the Insight Tag) "to analyze traffic on [its] web properties, that [her] personal health information [was] transmitted to [LinkedIn] as part of this process, and that [LinkedIn] feeds this information into its own advertising machinery." *Id.* But the reality is that the very practices she complains about were disclosed to her when signed up for Spring's and LinkedIn's services.

Plaintiff's claims, which she brings under the California Invasion of Privacy Act ("CIPA"), the Electronic Communications Privacy Act (the "Federal Wiretap Act"), and the California Constitution, fail as a matter of law. Her complaint should be dismissed in its entirety

for the same reasons that have doomed a host of other pixel cases in this District. *See, e.g.*, *Doe I*, 2024 WL 3490744, at *3–5 (lack of intent); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *5 (N.D. Cal. July 28, 2021) (plaintiff consented based on privacy policy); *James v. Allstate Ins. Co.*, 2023 WL 8879246, at *3 (N.D. Cal. Dec. 22, 2023) (party exception applied); *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1001 (N.D. Cal. 2024) (no real-time interception). The reasons for dismissal are multiple and overlapping:

***Disclosure.*** Plaintiff's entire action fails because the data practices she now complains about were disclosed to her. Both Spring and LinkedIn inform their users via their user agreements, privacy policies, and cookies policies that they collect users' data and that the data may be used for advertising purposes. These disclosures of the complained-of practices doom all of Plaintiff's claims, each of which require her to establish that she did not consent to the data practices at issue. *See, e.g.*, *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal of privacy claims based on disclosures in privacy policy); *Hammerling v. Google LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (same).

***Lack of intent.*** Plaintiff's claims also must be dismissed because she has failed to plausibly plead—and cannot plead—that LinkedIn knowingly and intentionally invaded her privacy, as required for each of her claims. To the contrary, LinkedIn expressly instructed Spring via its Ads Agreement that it must not place the Insight Tag on pages that would result in transmission of sensitive data, like health data, back to LinkedIn. It is the third party, here Spring, that controls the placement of the Insight Tag on its website, not LinkedIn. In other words, "[t]he takeaway from these allegations is that [LinkedIn] purposefully acted so as *not* to receive any personal health information." *Doe I*, 2024 WL 3490744, at *4. Absent well-pleaded allegations that LinkedIn intended for Spring to use its Insight Tag to collect and transmit user data that its Ads Agreement expressly prohibited collecting, Plaintiff's claims must all be dismissed. *See id.* at *4–5.

***CIPA Statutory Defects.*** Plaintiff's two CIPA claims suffer from multiple additional statutory defects requiring the claims to be dismissed.

*Section 631:* As an initial matter, LinkedIn is exempt from Section 631 liability under the

"party exception" rule, which says that a party cannot eavesdrop on its own communications. In addition, Plaintiff's claims under Section 631's three clauses each fail to state a claim. Courts have "uniformly" found that her clause one wiretapping claim does not apply to the Internet. *See, e.g., Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 743 (N.D. Cal. 2023). Her clause two interception claim fails because she has failed to allege that LinkedIn intercepts any communications while they were "in transit." *See Cody*, 718 F. Supp. 3d at 1001. And because the claims under those two clauses fail, Plaintiff's claim under the third derivative "use" clause must fail also. *See Love v. Ladder Fin., Inc.*, 2024 WL 2104497, at *2 (N.D. Cal. May 8, 2024).

*Section 632:* Plaintiff's Section 632 claim fares no better. California courts have held that Internet-based communications do not give rise to a reasonable expectation of privacy, *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014), and LinkedIn's code-based Insight Tag does not qualify as a "device" under Section 632. *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019).

***Federal Wiretap Act***. Plaintiff's federal wiretapping claim must be dismissed because the Act is a one-party consent statute. *Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023). Plaintiff's own allegations establish that Spring installed the Insight Tag on its website and, thus, consented to the collection and sharing of communications through its website. In addition, this claim also fails for all the reasons that doom Plaintiff's CIPA claims.

***California constitutional invasion of privacy.*** Plaintiff's claim for invasion of privacy under the California Constitution fails because she cannot allege that LinkedIn intruded upon her privacy at all, much less in a highly offensive manner. Given LinkedIn and Spring's disclosures about their data collection practices, Plaintiff fails to plausibly plead any reasonable expectation that her information would remain private to Spring only. Nor does she plead any facts showing that LinkedIn's conduct amounted to anything other than routine, commercial behavior that falls far short of an egregious breach of social norms sufficient to violate California's Constitution. *James*, 2023 WL 8879246, at *6.

All told, Plaintiff seeks to hold LinkedIn liable for violations of criminal statutes and California's Constitution by ignoring the disclosures to which she agreed in Spring's and

LinkedIn's user agreements, privacy policies, and cookie policies, and by assuming intent where none can be found. Her claims find no basis in the law and should be dismissed with prejudice.

## II. BACKGROUND

### A. LinkedIn provides its advertising partners with tools to run marketing campaigns, including through the Insight Tag.[1]

LinkedIn is a social network with a professional focus that helps its members find the right jobs, create and strengthen professional relationships, and learn skills to succeed in their careers. Compl. ¶ 41, n.32; Ex. F, Alderman Dec. In addition, LinkedIn offers advertising and marketing tools through its Marketing Solutions services. Compl. ¶ 41, n.33. Using these services, advertisers like Spring can direct their advertisements to LinkedIn's members so that those members receive advertisements relevant to their interests. Compl. ¶ 42.

LinkedIn's "Insight Tag" is a code snippet, offered through its Market Solutions services, that advertisers can add to their websites to help optimize ad campaigns for visitors of their websites. Compl. ¶¶ 48–49. Advertisers like Spring control the implementation of the Insight Tag on their websites: they choose whether to install the Tag at all, and, if so, where and on which pages to do so. Compl. ¶ 49, n.45; Ex. G, Alderman Dec. Advertisers install the Tag themselves or ask a third-party tag manager to add the Tag to their website; and they can choose to install the Tag as a "first-party cookie," which means it is stored directly in their websites' domain and is thus "offered by the website being visited." Compl. ¶ 49, n.45; Ex. G, Alderman Dec. After installation, the Tag uses cookies to transmit limited data about users' interactions

---

[1] Plaintiff does not allege when she joined LinkedIn's platform or when she interacted with Spring's website. Throughout her Complaint, Plaintiff also refers to and incorporates by reference versions of LinkedIn's and Spring's policies and disclosures available on October 22, 2024. To be consistent with Plaintiff's Complaint, LinkedIn cites to the October 22, 2024 versions of all relevant policies and disclosures. As explained in the concurrently filed Request for Judicial Notice, these materials are publicly available and properly subject to judicial notice, and/or they are subject to incorporation by reference.

with that website to LinkedIn, which Plaintiff alleges LinkedIn can use to make a "probabilistic match of a user's identity." Compl. ¶¶ 50, 52–53; *see* Ex. G, Alderman Dec. (noting that the Insight Tag has certain "default" settings, which can be adjusted by the advertiser).

**B. LinkedIn requires advertisers to comply with the LinkedIn Ads Agreement, which prohibits advertisers from transmitting sensitive data to LinkedIn.**

Before advertising with LinkedIn, an advertiser must agree to the LinkedIn Ads Agreement, which governs LinkedIn's relationship with its advertisers. Compl. ¶ 41; Ex. E, Alderman Dec. The Ads Agreement ***prohibits*** advertisers from sending sensitive information to LinkedIn via the Insight Tag:

> You will . . . not transfer to LinkedIn any data that you know or reasonably should know . . . constitutes Sensitive Data, including by . . . installing the Insight Tag on a page that collects medical, financial, or other Sensitive Data about identified or identifiable individuals.

Ex. E at § 5, Alderman Dec. "Sensitive Data" is defined to include any "data concerning health or sexual orientation." *Id.* § 13.3, Alderman Dec.

In addition to the Ads Agreement terms, LinkedIn also instructs advertisers like Spring to "never add" the Insight Tag to website "pages that collect or otherwise handle health, financial, or other sensitive data of individual users" in its description of the Insight Tag. Compl. ¶ 48, n.45; Ex. G, Alderman Dec. LinkedIn repeats that admonition in the "LinkedIn Insight Tag FAQs": the "Insight Tag should not be installed on web pages" that offer "specific health-related . . . services . . . to consumers." Compl. ¶ 48, n.46; Exs. H, H1, Alderman Dec.

**C. Both LinkedIn's and Spring's terms disclose the use and operation of the Insight Tag.**

**1. LinkedIn discloses to users that advertising partners may collect, use, and share user data with LinkedIn through pixel trackers.**

Plaintiff alleges that she is a LinkedIn member and, like all members, agreed to LinkedIn's User Agreement, Privacy Policy, Cookie Policy, and Cookie Table, and associated terms, each of which explain LinkedIn's "collection, use, and sharing of [Plaintiff's] personal data." Compl. ¶¶ 9, 56; Exs. A, A1 at § 1.1, Alderman Dec. She incorporates into her Complaint quotations from LinkedIn's User Agreement and Privacy Policy for their high-level mission

statements, Compl. ¶¶ 57–59, but tellingly omits the detailed disclosures about LinkedIn's privacy and advertising practices contained in those very same documents that make clear that her claims cannot survive.

LinkedIn's **User Agreement** provides that use of LinkedIn's services is subject to agreement to the User Agreement, the Privacy Policy, and the Cookie Policy, which detail "the collection, use, and sharing of [the user's] personal data." Exs. A, A1 at § 1.1, Alderman Dec. This includes, as Plaintiff alleges, services related to the Insight Tag. Compl. ¶ 58–59; Exs. A, A1 at § 1.1, Alderman Dec.

LinkedIn's **Privacy Policy** includes a section entitled "Cookies and Similar Technologies," which states that LinkedIn "use[s] cookies and similar technologies (e.g., pixels and ad tags) to collect data . . . to recognize you and your device(s) on, off and across different services and devices where you have engaged with [LinkedIn's] Services." Compl. ¶ 56; Ex. B at § 1.4, Alderman Dec.; *see also* Ex. B at § 2.4 (stating that LinkedIn targets ads to members using "[d]ata collected by advertising technologies on and off [LinkedIn's] Services using pixels, ad tags . . ., cookies, and other device identifiers"). The Privacy Policy further and explicitly states that LinkedIn "receive[s] information about your visits and interaction with services provided by others when you log-in with LinkedIn or visit others' services that include some of [its] plugins . . . or our ads, cookies or similar technologies." Ex. B at § 1.8, Alderman Dec. Finally, the Privacy Policy provides a link to controls on LinkedIn that allow a user to "opt out from [LinkedIn's] use of data from cookies and similar technologies that track [a user's] behavior on the sites of others for ad targeting and other ad-related purposes." *Id.* at § 1.4, Alderman Dec.

The LinkedIn **Cookie Policy** provides even further details regarding LinkedIn's data collection. The Cookie Policy reiterates that LinkedIn uses "cookies and similar technologies such as pixels . . . to collect and use data as part of [LinkedIn] Services." Compl. ¶ 56; Ex. C, Alderman Dec. It describes a pixel as a "tiny image that may be embedded within web pages and emails" that LinkedIn uses "to learn more about your interactions with email content or web content, such as whether you interacted with ads or posts." Ex. C, Alderman Dec. The Cookie Policy states that pixels are used to help LinkedIn "show relevant advertising to you more

effectively," including by "learn[ing] whether content has been shown to you or whether someone who was presented with an ad later came back and took an action . . . on another site," and refers back to the Privacy Policy for more information. *Id.*

Finally, LinkedIn's **Cookie Table**, discussed and linked in the Cookie Policy and incorporated into Plaintiff's Complaint, specifically discloses LinkedIn's Insight Tag. Compl. ¶ 52, n.51; Ex. D, Alderman Dec. That table lists "cookies that we and third parties place" and provides "information about the cookies that LinkedIn uses on third party sites including when LinkedIn's Insight Tag is installed on customers sites." Ex. D, Alderman Dec. Likewise, in its section "Cookies LinkedIn drops on third party sites," LinkedIn states that it "enables third party sites to include some of its services such as Insight Tag." *Id.* As Plaintiff alleges, relying on this table, these cookies include the "lms_ads" and "li_sugr" cookies, each of which can be used to attempt to "identify LinkedIn Members off LinkedIn for advertising." Compl. ¶¶ 52–53; Ex. D, Alderman Dec.

### 2. Spring's Legal & Terms discloses that Spring collects and shares user data with third parties for advertising purposes.

When Plaintiff first navigated to Spring's website, she saw Spring's "cookie banner." Compl. ¶ 98. That banner hovers in the middle of every Spring webpage on the right side of the screen, right next to fields where users like Plaintiff input data, unless and until those users click "ACCEPT" and acknowledge that: "Our website uses Cookies. By continuing to use our site, you are agreeing to our <u>Cookie Policy</u>." Compl. ¶¶ 100; Ex. J, Alderman Dec., ¶ 11. The underlined terms link to Spring's Legal & Terms, which contains a section entitled "Cookie Policy," and it "applies to all visitors, users, and others who reside within the United States." Compl. ¶ 100; Ex. I, Alderman Dec. Plaintiff partially quotes from and incorporates this cookie banner into her complaint; and, in fact, she affirmatively relies upon the cookie banner and language in Spring's Legal & Terms in her claim against Spring under the California Confidentiality of Medical Information Act ("CMIA"). Compl. ¶¶ 98–100, 147.

Within its **Legal & Terms**, Spring discloses how it collects and shares website visitors' personal information with third parties like LinkedIn for analytics and advertising. In the "Do

Not Sell My Personal Information CCPA" section of its Legal & Terms, Spring states that "we collect information that identifies, relates to, describes, references, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or device," including "medical condition," "sex (including gender identity, gender expression, pregnancy or childbirth and related conditions), sexual orientation," and "information on a consumer's interaction with a website, application, or advertisement." Ex. I, Alderman Dec. Spring notes that it gets this information "from forms you complete on our website." *Id.* And Spring explains that "we may disclose your personal information to a third party for a business purpose," which includes with "[a]dvertising service providers we use to assist us in providing personalized advertising." *Id.*

In the "**Cookie Policy**" section of its Legal & Terms, Spring discloses that it uses "Targeting Cookies:"

> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

Compl. ¶ 100; I, Alderman Dec. Likewise, in the "**Terms**" section of its Legal & Terms, Spring explains that "we or other third-party sites may use various tracking mechanisms such as cookies, web beacons and embedded scripts (collectively, 'Tracking Technologies') to automatically collect information about interactions with our Site," which includes "personal information" that "can be used by itself, or combined with other information, to personally identify you." Ex. I, Alderman Dec.

Spring repeats this disclosure in the "**Privacy Policy**" section of its Legal & Terms, noting that:

> Our website uses cookies, unique identifiers and similar technologies to collect information over time and across different websites when you use or visit our website. We or our third-party partners use common tracking tools to collect information about the pages you view, our website functions that you access, the buttons and icons you click, and to remember your login information and website settings to make it easier and more efficient for you to use your website, and to provide advertising content that we think may be of interest to you.

Ex. I, Alderman Dec.

**D. Plaintiff ignores these disclosures and tethers her privacy claims to threadbare allegations.**

Plaintiff alleges conclusorily that "LinkedIn never receives consent from users to intercept and collect electronic communications," despite the disclosures in LinkedIn's User Agreement, Privacy Policy, Cookie Policy, and Cookie Table—all of which Plaintiff alleges that she agreed to when she became a LinkedIn member. Compl. ¶¶ 9, 55–56. Plaintiff further alleges baldly that LinkedIn broke its promise to "only collect and process personal data about you where we have lawful bases." Compl. ¶ 61 (quoting Ex. B, Alderman Dec.). But Plaintiff fails to mention that that those "lawful bases" include (1) user "consent"; (2) "contract (where processing is necessary for the performance of a contract with you (e.g., to deliver the LinkedIn Services you have requested))"; and (3) LinkedIn's "legitimate interests." Compl. ¶ 59, n.56; Ex. B at § 5.3, Alderman Dec. Plaintiff also selectively quotes from Spring's "privacy policy." Compl. ¶ 100 (quoting Ex. I, Alderman Dec.).

Plaintiff next alleges that the "Insight Tag" allowed LinkedIn "to intercept and record 'CLICK' events," which "detail information about which page on [Spring's] Website the patient was viewing as well as the selections they were making." Compl. ¶ 89. Although Plaintiff speculates about what information can theoretically be shared through the Insight Tag when filling out forms on Spring's website, Compl. ¶¶ 66–72, 90, 103, Plaintiff alleges virtually no facts about her own experiences with Spring. Plaintiff does not allege when she visited Spring's website, whether she filled out Spring's forms, what information she disclosed to Spring, when she booked a consultation with Spring, when she attended her consultation, or when she received fertility services. Instead, Plaintiff merely alleges that she "booked a consultation for fertility services using [Spring's] Website," and then blindly asserts that Spring shared with LinkedIn "information related to the specific fertility treatment she received with Spring Fertility." Compl. ¶¶ 7, 10. Nowhere does Plaintiff allege *how* LinkedIn received information about the fertility treatment she "received" from Spring *after* she purportedly booked a consultation. Nor does Plaintiff allege that Spring shared any other information about her with LinkedIn, and she

concedes that the Insight Tag does not send directly personally identifiable information to LinkedIn, transmitting "li_sugr" and "lms_ads," which are number strings that can allegedly be used to identify LinkedIn members. Compl. ¶¶ 52, 90–91; Ex. D, Alderman Dec.

Finally, Plaintiff asserts without support that LinkedIn utilized her "sensitive personal and health information for [its] own purposes, including for targeted advertising." Compl. ¶ 173. Plaintiff does not substantiate this allegation with any facts; instead, she handwaves about the value of targeted advertising, writ large. Compl. ¶¶ 45–47. Although Plaintiff asserts that she "received targeted advertisements . . . relating to fertility services," Compl. ¶ 9, she does not allege that they were Spring's advertisements or that she received these advertisements *as a result of* Spring sharing information about her visit to its website with LinkedIn. Nor does Plaintiff allege any facts about Spring's and LinkedIn's relationship, or how LinkedIn used any data allegedly collected from Spring's website. Instead, Plaintiff explains how targeted advertising solely benefits "marketers and advertisers" like Spring, who can potentially use such information "to target potential customers." Compl. ¶ 45.

Based on these bareboned and conclusory allegations, Plaintiff contends that LinkedIn violated her privacy rights under two criminal statutes, CIPA and the Federal Wiretap Act, and the California Constitution. Compl., Count I, III–V. She seeks to represent a California and national class of all people who "had a Facebook or LinkedIn account and booked a consultation on www.springfertility.com." Compl. ¶ 106.

## III. ARGUMENT

### A. Plaintiff's entire action fails because Spring and LinkedIn disclosed and obtained her consent to collect and share her user information.

Each of Plaintiff's claims against LinkedIn requires her to establish that she did not consent to Spring collecting and sharing her data with LinkedIn. *See* Cal. Pen. Code § 631 (imposing liability only for interception "without the consent of all parties"); 18 U.S.C. § 2511(2)(d) (interception "shall not be unlawful . . . [where] one of the parties to the communication has given prior consent to [the] interception"); *Smith*, 745 F. App'x at 9 ("Knowing authorization of the practice constitutes Plaintiffs' consent."); *Hammerling*, 2024 WL

937247 at *3 (no reasonable expectation of privacy where Privacy Policy disclosed collection of data).

The Ninth Circuit has consistently affirmed the dismissal of privacy claims for failure to plead lack of consent where terms of service, privacy policies, or related disclosures describe the practices at issue. *See, e.g.*, *Smith*, 745 F. App'x at 9 (affirming dismissal of California state law claims where the practice complained of "f[ell] within the scope of [p]laintiffs' consent to Facebook's Terms and Policies"); *Hammerling*, 2024 WL 937247, at *3 (affirming dismissal of privacy claim where privacy policy "expressly disclosed Google's intention to track their activity on third-party apps"). A court can consider disclosure and consent issues on a motion to dismiss privacy claims. *Hammerling*, 2024 WL 937247, at *3 (affirming dismissal on this basis); *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (dismissing CIPA claim for failure to adequately allege lack of consent); *cf. Silver v. Strope*, 2021 WL 3191752, at *2 (N.D. Cal. July 28, 2021) (dismissing wiretap claims and noting that "[c]onsideration of consent is appropriate on a motion to dismiss where lack of consent is an element of the claim").

By Plaintiff's own allegations, Spring discloses the practices at issue in this action. Plaintiff incorporates by reference into her complaint Spring's "Cookies Policy," relying upon Spring's terms in support of her claim against Spring under the CMIA and characterizing Spring's "privacy policy" as inaccurately disclosing the company's data-disclosure practices. Compl. ¶¶ 100, 147. Plaintiff also incorporates Spring's "cookie banner" into her complaint, which Plaintiff would have been confronted with when she first navigated to Spring's website. Compl. ¶¶ 98–100. The banner is a persistent one: it shows up on every page, adjacent to the fields where users enter information, and it hovers at those pages' center and to the right, unless and until a user clicks "ACCEPT." Ex. J, Alderman Dec., ¶ 11. This banner also provides a hyperlink to Spring's "Cookies Policy," which directs users to a section within Spring's Legal & Terms. *Id.*

Spring's Legal & Terms disclosed the data practices that she complains of: that Spring collected and shared her data with third parties. Spring's Legal & Terms informs users that it collects information from a user's "interaction with a website," including information about a

user's "medical condition" or information related to their "pregnancy or childbirth," through various technologies, including "targeting cookies." Compl. ¶ 100; Ex. I, Alderman Dec. Spring further discloses that "third-party sites may use various tracking mechanisms such as cookies, web beacons and embedded scripts" to "automatically collect information about interactions with our Site," including "personal information." Ex. I, Alderman Dec. Spring then repeats these disclosures in its "Privacy Policy," noting that its website uses cookies, those cookies "collect information over time and across different websites when you use or visit our website," and those cookies "collect information about the pages you view" and "the buttons and icons you click" in order "to provide advertising content that we think may be of interest to you." *Id.* So it cannot come as a surprise to Plaintiff that Spring does exactly what it says it will in its disclosures.

LinkedIn similarly discloses that it "use[s] cookies and similar technologies (e.g., pixels and ad tags) to collect data . . . to recognize you and your device(s) on, off and across different services and devices where you have engaged with [LinkedIn's] Services." Ex. B at § 1.4, Alderman Dec; *see also* Ex. C, Alderman Dec. (LinkedIn uses "cookies and similar technologies such as pixels . . . to collect and use data as part of [LinkedIn] Services"). Indeed, LinkedIn expressly discloses the use of the Insight Tag in its Cookie Table, which is incorporated into its Cookie Policy, explaining clearly and unambiguously how it operates and what information it collects. Ex. C, Alderman Dec. Plaintiff effectively concedes that this disclosure is sufficient to put her on notice of LinkedIn's practices surrounding the Insight Tag, given that, when she alleges how the Insight Tag's "li_sugr" and "lms_ads" cookies operate, she quotes directly from LinkedIn's "Cookie Table," which is incorporated by reference into LinkedIn's Cookie Policy. Compl. ¶ 53; Ex. D, Alderman Dec.

Because these disclosures include the alleged data practices of which Plaintiff complains, all of her claims should be dismissed with prejudice. *See, e.g.*, *Smith*, 745 F. App'x at 9; *Silver*, 2021 WL 3191752, at *5; *Hammerling,* 2024 WL 937247, at *3; *Garcia*, 78 F. Supp. 3d 1125 at 1136; *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020).

**B. Plaintiff's entire action fails because LinkedIn prohibited Spring from transferring health data via the Insight Tag and thus lacked the requisite intent to invade her privacy.**

Plaintiff's claims require that LinkedIn knowingly and intentionally obtained her data without authorization and used it for an improper purpose. *See United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (the Federal Wiretap Act requires that "the defendant acted intentionally, that is, purposefully and deliberately and not as a result of accident or mistake"); *Doe I*, 2024 WL 3490744, at *6–7 ("CIPA liability only extends to willful or intentional conduct," and such "intent" is "a necessary element of an invasion of privacy claim" under California's Constitution). In third-party software cases like this one, Ninth Circuit precedent requires "something more than mere awareness that an interception might occur." *Doe I*, 2024 WL 3490744, at *3 (characterizing *Christensen*, 828 F.3d at 790). After all, CIPA and the Federal Wiretap Act are criminal statutes and thus impose a mens rea requirement of "guilty knowledge," which must be satisfied as to each element. *Stark v. Super. Ct.*, 52 Cal. 4th 368, 393 (2011); *see also Flores-Figueroa v. United States*, 556 U.S. 646, 658 (2009) (a criminal statute's mens rea requirement is generally applied to each element). Likewise, "negligent conduct" is not "actionable under the California Constitution" because it requires an "'egregious breach of the social norms underlying the privacy right.'" *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (quoting *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 655 (Cal. 1994)). When a company like LinkedIn advises its advertising partners to avoid sharing with it sensitive user information using its software, that company cannot have the requisite knowledge and intent necessary for a violation of these criminal statutes or the California Constitution. *Doe I*, 2024 WL 3490744, at *5.

Plaintiff does not plead that LinkedIn knowingly and intentionally invaded her privacy.

To the contrary, as part of LinkedIn Ads Agreement,[2] LinkedIn conditions Spring's use of the Insight Tag on its agreement to "not transfer to LinkedIn any data that you know or reasonably should know . . . constitutes Sensitive Data, including by way of installing the Insight Tag on a page that collects medical, financial, or other Sensitive Data about identified or identifiable individuals." Ex. E, Alderman Dec. LinkedIn repeats this requirement frequently, both on its "Insight Tag" page for its "Market Solutions" services, as well as in its Insight Tag FAQs. Exs. H–I, Alderman Dec. Plaintiff has not alleged (and cannot allege) any well-pleaded facts that LinkedIn intended for Spring to disregard this contractual requirement, was aware that Spring provided it with Plaintiff's purportedly sensitive information, or even used or desired to use that information for its own purposes.[3]

According to Plaintiff, Spring—not LinkedIn—chose which webpages would bear the Insight Tag and the information that would be transmitted through a click event. As alleged, and even crediting Plaintiff's conclusory allegations on this point, Plaintiff brings this suit based on *Spring*'s installation of the Insight Tag on website pages that handle health information, and not any action taken by LinkedIn. Compl. ¶ 89. Additionally, the "CLICK event information shared with LinkedIn" was "shared" by Spring, including the fertility treatments with which Plaintiff allegedly clicked on in the online form. Compl. ¶ 90. Put simply, LinkedIn had no control over the data that Spring supplied it or the webpages on which it installed the Tag.

In this respect, Plaintiff's factual assertions and claims are almost identical to those considered and recently dismissed by another district court in *Doe I*. 2024 WL 3490744, at *4–6.

---

[2] This document is publicly available at https://www.linkedin.com/legal/sas-terms, applies to Spring's conduct as an advertiser with LinkedIn, and governs LinkedIn's Marketing Solutions services, as described throughout Plaintiff's Complaint. *See, e.g.*, Compl. ¶¶ 41–47; Ex. E, Alderman Dec.

[3] Additionally, Plaintiff's bald allegation that Spring shared such information from her interaction with LinkedIn is unsupported by any well-pleaded allegation in her Complaint, as discussed further below.

There, as here, defendant specifically instructed website operators using its "copy-and-paste" source code on their websites for data collection and sharing purposes to not share any health information with it. *Id.* at *1, *2. Likewise, as here, plaintiffs did not allege a nefarious plot by defendant to secretly receive their health data for advertising, providing instead certain "hypothetical examples" about how marketers and advertisers "could target ads to patients" who visited their websites. *Id.* at *3. The *Doe I* court thus held that defendant lacked the requisite intent to violate CIPA or the California Constitution. *Id.* at *5–6. The same principle applies here. "There is nothing inherently unlawful about [LinkedIn] offering its source code" to Spring—"at least [given LinkedIn's] admonitions" to Spring that it "must avoid transmitting" health, medical, or other sensitive data. *Id.* at *4. And demonstrating that LinkedIn was part of a secret "plot to steal private health information" would undoubtedly require that Plaintiff meet Rule 9(b)'s "heightened pleading standards." *Id.* at *5. Here, the only plausible "takeaway from these allegations is that [LinkedIn] purposefully acted so as *not* to receive any personal health information." *Id.* at *4. Because LinkedIn did not knowingly or intentionally procure any sensitive information of Plaintiff's, she cannot plead the requisite intent to support any of her claims against LinkedIn.

### C. Plaintiff fails to state a CIPA claim under Section 631 because the party exception applies, and she otherwise fails to plead the elements of either a Section 631 or 632 claim.

Plaintiff brings CIPA claims under Sections 631 and 632 of the California Penal Code. These claims fail because LinkedIn is exempt from Section 631 under the party exception, and because she otherwise fails to plead (and cannot plead) the elements of either claim.

#### 1. LinkedIn is exempt from Section 631 under the "party exception" rule.

A party cannot wiretap or intercept its own communications under Section 631. *Williams v. DDRMedia LLC*, 2023 WL 5352896, at *5 (N.D. Cal. Aug. 18, 2023) (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020)); *Graham v. Noom*, 533 F. Supp. 3d 832, 832 (N.D. Cal. 2021); *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 899 (1975). Accordingly, as several courts in this District have held, a third-party service provider who provides software to a website operator to record its end users' interactions with its website is not wiretapping or

intercepting those communications; they are instead "an extension of" the website or application operator using its software. *See Williams*, 2023 WL 5352896, at *4 (collecting cases).

Plaintiff's Section 631 claim fails under this principle because her allegations establish that LinkedIn acted as no more than "an extension of" Spring. Plaintiff alleges that the Insight Tag is a "code snippet added to a website" by third-party providers to "help" them "optimize" their advertising campaigns, "retarget" their "website visitors," and "learn more" about "[their] audiences." Compl. ¶ 48. Plaintiff further alleges that *Spring* "incorporated the LinkedIn Insight Tag on its Website" and "utilized" the Insight Tag, which meant it theoretically "shared with LinkedIn the terms 'springfertility,' 'book-a-consult,' 'IVF,' and even a patient's sexual orientation." Compl. ¶¶ 64–65, 89–90. Finally, she concludes by stating that *Spring* "embedded the[ Insight Tag] on its Website for advertising purposes." Compl. ¶ 13. Plaintiff has thus failed to allege plausibly that LinkedIn acted as something other than an "extension" of Spring. *Williams*, 2023 WL 5352896, at *3.

To try to avoid the exception, Plaintiff asserts that LinkedIn used her information for its own "targeted advertising purposes." Compl. ¶ 92. This is presumably because some courts have held that a software vendor may fall outside of the party exception if a plaintiff has stated facts indicating that the relevant software provider has the "capability to use its record of the interaction" for its own purposes. *Cody*, 718 F. Supp. 3d at 1002. But Plaintiff's conclusory allegation is not supported by any well-pleaded facts. Indeed, Plaintiff does not even allege that she received targeted advertising on LinkedIn from *Spring* specifically. Compl. ¶ 9. Instead of alleging any well-pleaded facts plausibly showing how LinkedIn used any data collected from her use of the Spring website through the LinkedIn Tag, Plaintiff merely alleges that *all* data collected via the Insight Tag—regardless of type—has immense "value" for targeted advertising writ large. Compl. ¶ 15. Courts have repeatedly rejected arguments that allegations like Plaintiff's—and even some more detailed than hers—are sufficient to plead that a defendant is capable of using the communications for itself. *See, e.g.*, *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1122 (S.D. Cal. 2024) (insufficient allegations of "rout[ing]" chats through servers "allowing LivePerson to collect the chat data"); *Swarts*, 689 F. Supp. 3d at 745

(insufficient allegations that LivePerson "analyz[ed] data and provid[ed] . . . customer data metrics related to each conversation" and "accesse[d] and analyze[d]" those "conversations"); *Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 973 (N.D. Cal. 2023) (insufficient allegations that communications conducted on a Kaiser website were "routed through a Salesforce server," that Salesforce "directly receives the electronic communications of visitors" and "can view transcripts in real time").

Accordingly, Plaintiff fails to allege facts taking this case out of the party exception doctrine, which exempts LinkedIn from her Section 631 claim.

**2. Plaintiff cannot state a Section 631 claim under any of its three clauses.**

Section 631 contains three clauses prohibiting different forms of conduct: (1) intentional wiretapping; (2) willfully and without the consent of all parties to the communication, attempting to learn the contents or meaning of a communication in transit over a wire; and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities. *Turner v. Nuance Commc'ns, Inc.*, 2024 WL 2750017, at *4 (N.D. Cal. May 28, 2024). Plaintiff fails to plead a claim under any of the three.

**a. Plaintiff does not allege a wiretapping claim under the first clause of Section 631 because it does not apply to Internet communications.**

Some of Plaintiff's allegations could be read as an attempt to allege a claim under clause one. *See* Compl. ¶¶ 19–21, 113, 158 (alleging without support that LinkedIn "intentionally tapped or made unauthorized connections with, the lines of internet communications"). To the extent she attempts to do so, the claim fails as a matter of law. Clause one prohibits telephonic wiretapping, which does not apply to Internet transmissions like her interactions with the Spring website. *St. Aubin v. Carbon Health Techns., Inc.*, 2024 WL 4369675, at *4 (N.D. Cal. Oct. 1, 2024) (citing *Cody*, 718 F. Supp. 3d at 996); *see also Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 755 (N.D. Cal. 2023); *Google Assistant*, 457 F. Supp. 3d at 825.

**b. Plaintiff does not allege a claim under the second clause of Section 631 because she does not adequately allege an interception of contents of communications while in transit.**

To the extent Plaintiff attempts to assert a claim under the second clause of Section 631(a) for "intercepting" the contents of her communications with LinkedIn, that claim fails because Plaintiff has not adequately alleged that LinkedIn intercepted the contents of any communication "while in transit" between her device and the Spring website. *See* Cal. Pen. Code § 631(a).

Under Section 631(a), an alleged eavesdropper must listen to a communication "*while* the same is in transit[.]" *Cody*, 718 F. Supp. 3d at 998 (emphasis in original) (quoting Cal. Pen. Code § 631(a)). The allegations must demonstrate a party intercepted the communication "during [its] transmission," rather than once it was placed in electronic storage. *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876-77 (9th Cir. 2002)); *see also Hammerling*, 2022 WL 17365255, at *10 (dismissing claim where no plausible allegation of a "real-time" mechanism for intercepting communication by defendant).

As a starting matter, Plaintiff's allegations that Spring "disclosed" her information to LinkedIn are plainly inconsistent with her claim that LinkedIn "intercepted" her data while it was in transit. Compl. ¶¶ 92, 104, 111, 144, 148. Even setting those allegations of disclosure aside, Plaintiff's repeated yet conclusory assertion that LinkedIn "intercepts" her data is insufficient because she fails "to explain how the software works or how the interception occurs" with respect to any specific communications. *Cody*, 718 F. Supp. 3d at 1001 (concluding that plaintiff insufficiently pled "interception" when plaintiff merely alleged that "the third-party software is 'plugged into' Ring's website" and "allows chats to be routed 'in real time ... as they occur'"); *see also Hammerling*, 2022 WL 17365255, at *10 (dismissing CIPA claim where plaintiffs' bare allegation that defendant "collects 'real-time data'" does not plausibly allege data collection "in transit"). "Using the word 'intercept' repeatedly is simply not enough without the addition of specific facts that make it plausible [that LinkedIn] is intercepting [Plaintiff's] data in transit." *Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) (concluding that adding the word "simultaneously" to previously dismissed complaint did not cure CIPA deficiency). Beyond invoking the word "intercept" repeatedly, Plaintiff never alleges specific

facts about what information she provided to Spring, what information was specifically relayed to LinkedIn, or when and how the alleged interception occurred. In fact, Plaintiff has so little to allege about LinkedIn's purported actions that she even mistakenly conflates the information that the Insight Tag allegedly collects with information that Meta's Tracking Pixel collects, asserting baldly that Meta's Pixel "captures" a "Facebook ID, email address, first name, last name, and phone number" and "[t]he same is true of the LinkedIn Insight Tag." *See* Compl. ¶ 103. Interception is therefore insufficiently pled. *See Quigley v. Yelp, Inc.*, 2018 WL 7204066, at *4 (N.D. Cal. Jan. 22, 2018) (plaintiff failed to plead interception when he did not allege "how or when any defendant became aware of his communications").

**c. Plaintiff does not allege a claim under the third clause of Section 631 because it is derivative and fails for the same reasons as her claims under clauses one and two.**

To the extent Plaintiff attempts to assert a "use" claim under the third clause, it too fails because it is derivative of her other CIPA claims. *See Google Assistant*, 457 F. Supp. 3d at 827.

**3. Plaintiff cannot state a Section 632 claim.**

Plaintiff also brings a claim under Section 632 of CIPA, which prohibits "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio[.]" This claim fails as a matter of law for two independent reasons.

**a. Plaintiff's Section 632 claim fails because she does not adequately allege that her communications were confidential.**

Section 632 only applies to communications that are "confidential." A communication is "confidential" under Section 632 only if a party "has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1073 (N.D. Cal. 2021) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77 (2002)). "California appeals courts have generally found that Internet-based communications are not 'confidential' within the meaning of [S]ection 632, because such communications can easily be shared by, for instance, the recipient(s) of the communications." *Campbell v. Facebook, Inc.*, 77

F. Supp. 3d 836, 849 (N.D. Cal. 2014) (collecting cases). Accordingly, courts "have developed a presumption" that such communications do not give rise to an expectation of privacy such that Internet-based Section 632 claims generally fail. *Swarts*, 689 F. Supp. 3d at 746–47 (citation omitted). That is precisely the case here: Plaintiff's allegations relate solely to the Insight Tag's alleged collection of data via the Spring website, where Spring discloses to users like Plaintiff that it might share information collected on the website with its advertising partners. Accordingly, because Plaintiff's communications were not "confidential" as required by Section 632, her claim fails as a matter of law.

**b. Plaintiff's Section 632 claim fails because she does not plausibly plead that LinkedIn used an electronic amplifying or recording device.**

Plaintiff's Section 632 claim also fails because she does not plausibly plead that LinkedIn used an "electronic amplifying or recording device." While Section 631 prohibits "'wiretapping,' i.e., intercepting communications by an unauthorized *connection* to a transmission line," Section 632 prohibits "'eavesdropping,' i.e., the interception of communications by the use of *equipment* which is not connected to any transmission line." *People v. Ratekin*, 212 Cal. App. 3d 1165, 1168 (1989) (second emphasis added). In other words, under Section 632, eavesdropping must occur via a "device," which has a plain, commonsense meaning of "a thing made or adapted for a particular purpose, especially a piece of mechanical or electronic equipment." *Moreno v. S.F. Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14, 2017) (citing dictionary definitions). Multiple courts have held that software and software applications are not "devices" under Section 632 and other sections of CIPA. *See Doe v. Microsoft Corp.*, 2023 WL 8780879, at *8 (W.D. Wash. Dec. 19, 2023) (holding that "software does not constitute a 'device'" under Section 632); *In re Google Location History Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (Google software); *Moreno*, 2017 WL 6387764, at *5 (BART Watch mobile application). Again, Plaintiff's allegations relate entirely to her interaction with webpages and the Javascript-based Insight Tag. Neither websites nor Javascript code are "devices" within the meaning of CIPA, and so the Section 632 claim fails.

**D. Plaintiff fails to plead a Federal Wiretap Act claim.**

The consent of one party is a complete defense to liability under the Federal Wiretap Act. 18 U.S.C. § 2511(2)(d) (not unlawful to intercept a "communication" where "one of the parties to the communication has given prior consent"); *see also Pyankovska*, 65 F.4th at 1074 (noting that the Act is a "one party" consent statute). Plaintiff squarely alleges that Spring "embedded" the "Insight Tag on its Website" for "advertising purposes" and "utilized" the "Insight Tag" to "share[] its patients'" sensitive information with "two of the world's largest social media companies." Compl. ¶¶ 13, 64–65. When the "alleged interception of private health information only occurs because the health care providers cho[se] to install [LinkedIn] source code on their web properties," then "[t]his must mean the providers consented to the operation of [LinkedIn] source code." *Doe I*, 2024 WL 3490744, at *5. Because Plaintiff concedes that Spring consented to sharing data it collects from its users by affirmatively embedding the Insight Tag into its website, and Spring is a receiving party to any data it collects, the Federal Wiretapping Act claim should be dismissed without leave to amend. *See Roe v. Amgen Inc.*, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (concluding that plaintiff's Federal Wiretapping Act claim was "barred pursuant to the one-party consent provision" when defendant, "as the creator and operator of its website, consented to the use of data collection tools it installed on its website.").

Plaintiff also fails to adequately plead the other elements of a Federal Wiretap Act claim for all of the same reasons that require dismissal of Plaintiff's Section 631 claim under CIPA. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) (Federal Wiretap Act requires interception to occur during "transmission"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) ("Courts perform the same analysis for both the Wiretap Act and CIPA regarding the party exemption.").

**E. Plaintiff fails to state a claim for invasion of privacy under the California Constitution.**

For an invasion of privacy claim under the California Constitution, courts consider "(1) the nature of any intrusion upon reasonable expectations of privacy, and (2) the offensiveness or seriousness of the intrusion, including any justification and other relevant interests."

*Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1074 (Cal. 2009). Plaintiff fails to clear the "high bar" for establishing a claim for invasion of privacy. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1038 (N.D. Cal. 2014).

*First*, Plaintiff fails to plausibly plead a reasonable expectation of privacy under the circumstances. As discussed above, LinkedIn's User Agreement, Privacy Policy, Cookie Policy, and associated terms—all of which Plaintiff agreed to—"expressly disclosed [LinkedIn's] intention to track [Plaintiff's] activity on third-party [webpages]," and as a result, she has "no reasonable expectation of privacy in that data." *Hammerling*, 2024 WL 937247, at *3; *see also Smith*, 745 F. App'x at 9 ("Knowing authorization of the practice constitutes [p]laintiffs' consent"). Plaintiff's lack of reasonable expectation of privacy under the pleaded circumstances is only bolstered by the copious disclosures on Spring's website, each of which detail that Spring will collect and share user data with third parties for advertising purposes. *See* Ex. I, Alderman Dec. These disclosures bar Plaintiff's invasion of privacy claim.

*Second*, even setting aside LinkedIn's and Spring's disclosures, Plaintiff fails to allege anything close to a highly offensive intrusion upon her privacy. "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill*, 865 P.2d at 655. As set forth above, *see supra* Section II.A.–B., website operators like Spring install LinkedIn's Insight Tag voluntarily on their websites to collect data about user engagement; LinkedIn expressly prohibits them from installing the Tag on webpages that handle or collect any sensitive information; and LinkedIn and Spring both disclose their data collection practices to users like Plaintiff. Plaintiff does not allege any facts showing that she received any targeted advertisements based on any specific data collected from her use of Spring's website—from Spring, on LinkedIn, or otherwise. Alleging no well-pleaded facts showing what information LinkedIn collected from her specifically (as opposed to a hypothetical "consumer"), Plaintiff merely handwaves, saying that Spring collected and shared with LinkedIn "information related to the specific fertility treatment she received," and then points the Court to Spring's book-a-consult flow and alleges generally that the LinkedIn Tag can transmit information about a user's

"click[s]" on Spring's website, such as the event "formAction: book-a-consult-location/?rel=H&int=IVF&r-CA&feid=4-255969#gf_41." Compl. ¶¶ 10, 65–72, 89–90.

Indeed, even assuming that these allegations are sufficiently tethered to her (they are not), Plaintiff had yet to receive any fertility treatment *information* when she interacted with Spring's website, much less receive any specific form of fertility *treatment* when she clicked on Spring's webpages. At most, Plaintiff was, at the time, merely browsing Spring's website and allegedly clicking on generic, publicly available information related to potential fertility treatments. Under these circumstances, LinkedIn could not have intentionally intruded upon Plaintiff's privacy at all, much less in a manner that amounts to an egregious breach of societal norms.

Courts have repeatedly held that allegations like Plaintiff's, even if they could constitute an intrusion, are not actionable. In *Smith*, the Ninth Circuit affirmed dismissal of constitutional privacy claims tethered to the collection of "sensitive" health-related data, reasoning that the "data show[ed] only that [p]laintiffs searched and viewed publicly available health information." 745 F. App'x at *9 (affirming *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017)). There, the collected data included URLs "containing information about treatment options for melanoma, information about a specific doctor," and "search results related to the phrase 'intestine transplant.'" *Smith*, 262 F. Supp. at 954–55. Likewise, as the district court in *Low v. LinkedIn Corp.* held, "[e]ven disclosure of personal information, including social security numbers, does not constitute an 'egregious breach of the social norms' to establish an invasion of privacy claim." 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012). The *Low* court dismissed plaintiffs' assertions that the disclosure "to third parties [of] the LinkedIn ID and the URL of the LinkedIn profile page that the user viewed (which in the aggregate discloses a user's browsing history among LinkedIn profiles)" was sufficiently serious under California law, holding that such conduct is hardly an "egregious breach of social norms, but [is instead] routine commercial behavior." *Id.* Similarly, in *Hammerling*, the district court, in a decision affirmed by the Ninth Circuit, concluded that the defendant's collection of "granular information" from a plaintiff's interactions and searches within third-party apps on her Android smartphone amounted to "data collection of 'routine commercial behavior,' not considered a highly offensive intrusion of

privacy in this district." 2022 WL 17365255, at *9. So too in *Ojeda v. Kaiser Permanente Int'l, Inc.*, where the district court also considered and rejected plaintiff's assertion that the disclosure of her vaccination status could constitute an "egregious breach of social norms." 2022 WL 18228249, at *7 (C.D. Cal. Nov. 29, 2022). Other courts agree and routinely reject privacy claims tethered to such conduct as an insufficiently serious invasion of privacy. *See, e.g.*, *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 988 (N.D. Cal. 2014) (holding that the "commingling and disseminating" of user data to third parties for advertising purposes in alleged contravention of the defendant's own privacy policies was not an egregious breach of social norms); *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063 (holding that the disclosure to third parties of unique device identifier number, personal data, and geolocation information did not constitute an egregious breach of social norms).

Plaintiff's invasion of privacy claim against LinkedIn falls far short of the "high bar" for constitutional privacy claims and should be dismissed.

## IV. CONCLUSION

LinkedIn respectfully requests that the Court dismiss this entire action with prejudice, as any amendment would be futile.

Dated: January 10, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Christina Lee*

BENJAMIN BERKOWITZ
MATAN SHACHAM
CHRISTINA LEE
MAXWELL E. ALDERMAN
SPENCER MCMANUS
ROBYN PARISER
JONHATAN A. ARAGON

Attorneys for Defendant LINKEDIN CORPORATION