United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| L.B., Plaintiff, v. LINKEDIN CORPORATION, Defendant. | Case No. 5:24-cv-06832-EJD<br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND**<br>Re: ECF No. 13 |
| J.S., Plaintiff, v. SPRING FERTILITY HOLDINGS ET AL., Defendant. | Case No. 5:24-cv-07374-EJD<br>**ORDER GRANTING META'S MOTION TO SEVER; GRANTING REMAINING MOTIONS TO DISMISS WITH LEAVE TO AMEND**<br>Re: ECF No. 41, 45, 49 |
| V.R., Plaintiff, v. LINKEDIN CORPORATION, Defendant. | Case No. 5:24-cv-07399-EJD<br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND***<br>Re: ECF No. 28 |
| J.P., Plaintiff, v. LINKEDIN CORPORATION, Defendant. | Case No. 5:24-cv-07586-EJD<br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS WITH LEAVE TO AMEND**<br>Re: ECF No. 17 |

United States District Court
Northern District of California

Plaintiffs in four[1] related cases bring putative class actions against Defendant LinkedIn Corporation ("LinkedIn") and others concerning alleged breaches of privacy involving the use of LinkedIn's "Insight Tag" software on health-related websites. Before the Court are six separate motions across the above-captioned cases:

- LinkedIn's motion to dismiss in *L.B. v. LinkedIn Corp.*, Case No. 5:24-cv-06832, ECF No. 13
- LinkedIn's motion to dismiss in *J.S. v. Spring Fertility Holdings, LLC et al*., Case No. 5:24-cv-07374, ECF No. 41
- Defendant Spring Fertility Holdings, LLC's ("Spring Fertility," and together with LinkedIn, "Defendants") motion to dismiss in *J.S. v. Spring Fertility Holdings, LLC et al*., Case No. 5:24-cv-07374, ECF No. 45
- Defendant Meta Platforms, Inc.'s ("Meta") motion to sever claims against it in *J.S. v. Spring Fertility Holdings, LLC et al*., Case No. 5:24-cv-07374, ECF No. 49
- LinkedIn's motion to dismiss in *V.R. v. LinkedIn Corp.*, Case No. 5:24-cv-07399, ECF No. 28
- LinkedIn's motion to dismiss in *J.P. v. LinkedIn Corp.*, Case No. 5:24-cv-07586, ECF No. 17

Though certain facts vary across the complaints, the putative class actions center around largely similar facts and issues of law. This became especially apparent after June 5, 2025, when the Court heard oral argument on the above motions and considered consolidating the related cases. *See, e.g.*, Case No. 5:24-cv-07586, ECF No. 32. As such, the Court finds it appropriate to address all the motions to dismiss together but will raise any distinctions as they become relevant.

[1] This Order does not address three other related cases that have been filed against LinkedIn. The Court compelled one case to arbitration (*L.W.A. v. LinkedIn Corp.*, Case No. 5:24-cv-08436, ECF No. 52), and there are no motions pending before the Court in the other two (*Doe v. LinkedIn Corp. et al*, Case No. 5:25-cv-03737; *Hays v. LinkedIn Corp.*, Case No. 5:25-cv-04181).

United States District Court
Northern District of California

## I. BACKGROUND

### A. Factual Background[2]

LinkedIn markets itself as "the world's largest professional network on the internet" and provides a platform to help users find jobs or expand their professional networks. *J.P. v. LinkedIn Corp.*, Case No. 5:24-cv-07586, ECF No. 1 ("J.P. Compl.") ¶ 15.[3] But that is not its only business. LinkedIn also operates in the marketing and advertising space with its Marketing Solutions services, which provide an opportunity for potential advertisers to reach users around the world. *Id.* Using these services, advertisers can target particular audiences based on the advertisers' desired demographics. *Id.* ¶¶ 16, 18–19. To support this capability, LinkedIn allegedly collects users' personal information and communications through its services. *Id.* ¶ 17. LinkedIn uses that data to make inferences about users' demographics, intent, behavior, engagement, interests, and buying decisions, all of which fuel a suite of services within LinkedIn's Marketing Solutions. *Id.* ¶ 18.

As part of this business model, LinkedIn offers the Insight Tag. The Insight Tag is a piece of JavaScript-based code often referred to as a "tracking pixel" that advertisers can install on their websites. *Id.* ¶¶ 22–23. When the advertiser installs the Insight Tag and a LinkedIn account holder visits the advertiser's website, the visitor's internet browser will send certain information about the visitor's actions on the website to LinkedIn. *Id.* ¶¶ 23–27, 39. LinkedIn then uses that data to identify the visitor as a particular LinkedIn account holder and provide insights to the advertiser about its audience. *Id.* ¶¶ 24–27.

---

[2] Pursuant to Federal Rule of Evidence 201, the Court **GRANTS** Defendants' unopposed requests to take juridical notice of all documents listed in the following filings: Req. for J. Notice ("RJN") in L.B., ECF No. 24; RJN in J.S., ECF Nos. 42, 46; RJN in V.R., ECF No. 28-1; RJN in J.P., ECF No. 18. These documents include: three LinkedIn webpages; LinkedIn's Privacy Policy, Ads Agreement, Ad Policies, User Agreement, Cookie Policy, and Cookie Table; Spring Fertility's Cookie Banner and Legal & Terms; a CityMD webpage; and the Registration of Foreign Limited Liability Company record for Village Practice Management Company, LLC. *Id.* The Court finds these documents are either incorporated or relied upon in the complaint, or capable of being accurately and readily determined from sources whose accuracy cannot be questioned.

[3] The Court cites from the complaint in *J.P. v. LinkedIn Corp.*, because the facts and claims in all four of the above-captioned actions are similar, if not identical. The Court will discuss material differences between the complaints where necessary.

United States District Court
Northern District of California

**B. Procedural Background**

On August 20, 2024, Plaintiff L.B. filed the first of the above-captioned cases in Santa Clara Superior Court. *See L.B. v. LinkedIn Corp.*, Case No. 5:24-cv-06832, ECF No. 1. LinkedIn removed that complaint to this Court one week later. *Id.* LinkedIn filed its motion to dismiss L.B.'s complaint on October 25, 2024. *Id.*, ECF No. 13.

On October 22, 2024, Plaintiff J.S. filed suit against Spring Fertility, Meta, and LinkedIn in this Court. *J.S. v. Spring Fertility Holdings, LLC et al*, Case No. 5:24-cv-07374, ECF No. 1. LinkedIn filed the instant motion to dismiss on January 10, 2025 (*id.*, ECF No. 41) and Spring Fertility filed its own motion to dismiss the same day (*id.*, ECF No. 45). Three days later, Meta filed its motion to sever the claims against it. *Id.*, ECF No. 49.

On October 23, 2024, Plaintiff V.R. filed the third complaint against LinkedIn before this Court. *V.R. v. LinkedIn Corp.*, Case No. 5:24-cv-07399, ECF No. 1. LinkedIn filed a motion to dismiss on January 27, 2025 (*id.*, ECF No. 13), and V.R. responded by filing an amended complaint (*id.*, ECF No. 25). Less than one month later, LinkedIn filed the motion to dismiss the first amended complaint that is pending now. *Id.*, ECF No. 28.

And on November 1, 2024, LinkedIn removed another complaint filed against it by Plaintiff J.P. in Santa Clara Superior Court. *See J.P. v. LinkedIn Corp.*, Case No. 5:24-cv-07586, ECF No. 1. LinkedIn filed its motion to dismiss that complaint on November 22, 2024. *Id.*, ECF No. 17. The Court related the above-captioned cases on January 3, 2025. *Id.*, ECF No. 32.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul*

*Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft*, 556 U.S. at 678.

If the court concludes that a Rule 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

## III. DISCUSSION

In their motions to dismiss, Defendants raise various arguments regarding: (1) consent as a defense to all claims; (2) lack of intent as a defense to all claims; (3) choice of law; (4) CIPA § 631; (5) CIPA § 632; and (6) invasion of privacy under the California Constitution.[4] The Court examines each in turn.

### A. Motion to Sever

But first, the Court addresses Meta's motion to sever. Meta seeks to sever the claims asserted against it in *J.S. v. Spring Fertility Holdings, LLC et al*, Case No. 5:24-cv-07374, and consolidate them with those in the earlier-filed *In re Meta Pixel Healthcare Litigation*, Case No. 3:22-cv-03580-WHO (N.D. Cal. June 17, 2022) (the "Meta Pixel Action"). Were Meta to succeed, J.S. would join the putative class in the Meta Pixel Action and assert her claims against Meta there, leaving J.S.'s claims against Spring Fertility and LinkedIn before this Court.

"On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. District courts have "broad discretion in determining whether to order severance under Rule 21." *Bodri v. Gopro, Inc.*, No. 16-CV-00232-JST, 2016 WL 1718217, at *1 (N.D. Cal. Apr. 28, 2016). Severance is proper where "it will serve the ends of justice and further the prompt and efficient disposition of litigation." *Khanna v. State Bar of Cal.*, No. C-07-2587 EMC, 2007 WL 2288116, at *2 (N.D. Cal. Aug. 7, 2007) (citation omitted). To that end, courts weigh five non-exhaustive factors in

[4] The Court need not separately examine the remaining claims in *J.S. v. Spring Fertility Holdings, LLC et al*, Case No. 5:24-cv-07374, for the reasons explained in Section III.B.2.

deciding whether to sever: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *S.E.C. v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *4 (N.D. Cal. July 29, 2010).

Here, the balance of the five factors and broader efficiency considerations weigh in favor of severing. The claims against Meta and underlying facts here are duplicative of—or at least substantially overlap with—those in the Meta Pixel Action. Both cases involve allegations that Meta received sensitive health information through healthcare providers' installation of Meta's Pixel on their websites. *Compare* J.S. Compl. ¶¶ 13–14, ECF No. 1, *with* Meta Pixel Action Compl. ¶ 1, 3:22-cv-03580-WHO, ECF No. 335. Both actions assert claims for violations of the ECPA, CIPA sections 631 and 632, and common law invasion of privacy. *Compare* J.S. Compl. ¶¶ 115–82, *with* Meta Pixel Action Compl. ¶¶ 413–86. And Plaintiff J.S. falls within the putative class as it is defined in the Meta Pixel Action: "All Facebook users whose health information was obtained by Meta from their healthcare provider or covered entity through Meta Collections Tools[, including Meta Pixel]." Meta Pixel Action Compl. ¶ 353. Given these overlapping issues of fact and law, severance and consolidation would likely promote judicial economy by avoiding simultaneous and largely duplicative discovery proceeding in parallel in separate cases. Further, allowing the claims against Meta to proceed in this case could risk inconsistent rulings with those in the Meta Pixel Action, resulting in prejudice to Meta.

Even so, J.S. contends that severance should be denied because this case is materially different from the Meta Pixel Action. J.S. argues that the Meta Pixel Action specifically covers interception of patient data through patient portals offered by hospital systems, which is not what the claims here concern. In support, J.S. points to orders in other cases declining to consolidate claims into the Meta Pixel Action as evidence that courts have rejected attempts to increase the scope of the Meta Pixel Action. *See Doe v. GoodRx Holdings, Inc.*, Case No. 23-cv00501-AMO,

United States District Court
Northern District of California

ECF No. 207 (N.D. Cal. July 31, 2024); *Doe v. Hey Favor, Inc.*, Case No. 23-cv-00059-WHO, ECF No. 117 (N.D. Cal. Jan. 17, 2024). Because the claims here are different from those in the Meta Pixel Action, J.S. argues that severance would not result in gains in judicial efficiency or avoidance of prejudice.

The Court disagrees. The cases J.S. cites are distinguishable, as they were based on Judge Orrick's determination that "telemed cases" concerning healthcare apps were not a part of the Meta Pixel Action. *See Hey Favor, Inc.*, Case No. 23-cv-00059-WHO, ECF No. 78 (June 15, 2023 Hr'g Tr.) at 6:6–17. J.S. does not allege that Spring Fertility is exclusively a telemed provider using a healthcare app. Nor does J.S. dispute that Spring Fertility is a covered entity like the providers in the Meta Pixel Action. Indeed, J.S.'s complaint avers that Spring Fertility "provides fertility services and treatments" and must "comply with the requirements of HIPAA and/or the CMIA" (J.S. Compl ¶¶ 13, 105), placing Spring Fertility within the definition of "covered entities" in the Meta Pixel Action. *See* Meta Pixel Action Compl. ¶ 21. J.S.'s argument that there is no basis to consider the "fantastical" and "untested" class definition in the Meta Pixel Action is likewise unavailing. That the Meta Pixel Action has not reached class certification is of no moment. The stage of that case does not change the fact that the claims and issues being litigated in the Meta Pixel Action substantially overlap with those at issue here. Given the similarities between this case and the litigation already proceeding before Judge Orrick, the Court finds it would be beneficial to both parties for J.S.'s claims against Meta to continue in the Meta Pixel Action.

Accordingly, the Court **GRANTS** Meta's motion to sever the claims against it. J.S.'s claims against Meta shall be related to and consolidated with the Meta Pixel Action. J.S.'s claims against Spring Fertility and LinkedIn remain before this Court and are addressed further *infra*.

**B. Consent**

Turning now to Defendants' motions to dismiss, each of Plaintiffs' claims hinges on whether Plaintiffs consented to LinkedIn collecting their data from the third-party websites. *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 619 (N.D. Cal. 2021) (collecting cases); *see also*

United States District Court
Northern District of California

*infra* Sections III.E., III.F., III.G (discussing consent as an element of Plaintiffs' claims). Defendants argue that Plaintiffs consented to LinkedIn collecting their data by agreeing to various disclosures. For a defendant to show consent through disclosures, the disclosures must "explicitly notify" users of the practice at issue and must have only one plausible interpretation. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019); *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 190 (N.D. Cal. 2019) ("Consent is only effective if the person alleging harm consented to 'the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent."). While there may be "subtle differences" among consent doctrines, "the question under [each] is essentially the same: Would a reasonable user who viewed [the defendant's] disclosures have understood that [it] was collecting [the information at issue]?" *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014).

Defendants argue that Plaintiffs consented to LinkedIn's data collection by agreeing to: (1) LinkedIn's Privacy Policy, and (2) in J.S.'s case only, Spring Fertility's Cookies Policy and Privacy Policy.

**1. Consent Based on LinkedIn Disclosures**

Plaintiffs are all LinkedIn account holders. When Plaintiffs signed up for a LinkedIn account and used LinkedIn's services, they agreed to LinkedIn's User Agreement, Privacy Policy, and Cookies Policy. L.B. Compl. ¶ 29; J.S. Compl. ¶ 56; V.R. Compl. ¶ 32; J.P. Compl. ¶ 30. LinkedIn's Privacy Policy discloses that LinkedIn "use[s] cookies and similar technologies (e.g., pixels and ad tags) to collect data . . . on, off and across different services and devices where [users] have engaged with [LinkedIn's] Services." L.B. Compl. ¶ 31 (quoting Privacy Policy, LinkedIn, https://www.linkedin.com/legal/privacy-policy (Sept 18, 2024)); J.S. Compl. ¶ 58 (same); V.R. Compl. ¶ 34 (same); J.P. Compl. ¶ 32 (same). LinkedIn likewise discloses that it receives "information about [users'] visits and interaction with services provided by others" when members "visit others' services that include . . . [LinkedIn's] cookies or similar technologies." L.B. Case, Reddy Decl., Ex. D, LinkedIn Privacy Policy § 1.8, ECF No. 14-5. LinkedIn also

United States District Court
Northern District of California

explains that it targets ads using "[d]ata collected by advertising technologies on and off [LinkedIn's] Services using pixels, ad tags (e.g., when an advertiser installs a LinkedIn tag on their website) cookies, and other device identifiers." *Id.*

Plaintiffs acknowledge these policies in their complaints but argue that the disclosures are not specific to the conduct alleged in their complaints; that there is no reasonable expectation *medical* data will be shared with LinkedIn from third-party websites given the inherently sensitive nature of this information; and that the Court must accept as true their allegations that "LinkedIn never received consent from Plaintiff or received permission to track or sell her data to advertisers." L.B. Compl. ¶ 6; J.S. Compl. ¶ 10; V.R. Compl. ¶ 8; J.P. Compl. ¶ 7.

The Court organizes Plaintiffs' arguments into two overarching questions: (1) did LinkedIn sufficiently disclose that it would collect data from third-party websites; and (2) if so, is it reasonable to expect that this data would include the information at issue here?

**a. Did LinkedIn disclose it would collect data from third-party websites?**

The Court answers this first question in the affirmative. The Ninth Circuit recently examined a similar disclosure in *Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247, at *1–2 (9th Cir. Mar. 5, 2024), where Google notified users that it would collect their data from "apps that use [Google's] services." The Circuit found this language unambiguously disclosed Google's collection of user activity data from third-party apps. *Id.* Prior to *Hammerling*, two other Northern District courts likewise found explicit consent to the collection of user data from third-party websites when the notices informed users that the defendants would "collect information about your online activity over time and across different websites or online services," *Silver v. Stripe Inc.*, No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *5 (N.D. Cal. July 28, 2021); or "provide personal information to our affiliates and other trusted businesses or persons to process it for us," *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020).

Similarly here, LinkedIn's disclosures provide sufficient notice of its general collection practices. LinkedIn not only discloses that it "use[s] cookies and similar technologies (e.g., pixels

United States District Court
Northern District of California

and ad tags) to collect data . . . on, off and across different services and devices where [users] have engaged with [LinkedIn's] Services," but it also explicitly explains how the Insight Tag works—by using "[d]ata collected by advertising technologies on and off [LinkedIn's] Services using pixels, ad tags (e.g., when an advertiser installs a LinkedIn tag on their website) cookies, and other device identifiers." This is precisely the conduct alleged here—that LinkedIn uses its Insight Tag to collect data from third party websites. This level of specificity distinguishes this case from those cited by Plaintiffs where courts have found disclosures impermissibly vague. *See, e.g., In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (finding the plaintiffs' decision whether to opt out of personalized ads was not dispositive of Google's alleged sale and disclosure plaintiffs' information to third parties because the policy did not concern the *sale and disclosure* to third parties); *Yoon v. Meta Platforms, Inc.*, No. 24-CV-02612-NC, 2024 WL 5264041, at *4 (N.D. Cal. Dec. 30, 2024) (finding Meta's terms of service, data policy, and cookies policy never specifically indicated that Meta may acquire video viewing history obtained from Facebook users' interactions on third-party websites); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) (finding the disclosure that Facebook "may use the information we received about you" for "data analysis" was not specific enough to establish that users expressly consented to the scanning of the content of their messages for alleged use in targeted advertising."). The Court therefore finds LinkedIn's disclosures sufficiently inform users that the Insight Tag may track their data from third-party websites.

**b. Is it reasonable to expect that this data would include the information at issue here?**

However, just because Plaintiffs consented to LinkedIn collecting its data from third-party websites does not give LinkedIn carte blanche to collect any and all data. *See In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013) ("[C]onsent is not an all-or-nothing proposition."). Even with LinkedIn's disclosures, Plaintiffs could still have a reasonable expectation of privacy in certain types of data—i.e., medical-related information.

Courts have often found a lack of consent when the type of data collected, though

conceivably included in the disclosure, falls outside the plaintiffs' reasonable expectations. For example, in *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 784–85 (N.D. Cal. 2022), the plaintiffs alleged Facebook's Meta Pixel transmitted certain personal information to Facebook when they logged into secured patient portals on their medical provider's websites. The court found that, though Meta's policies notified users that it collects and uses personal data from third-party websites, it did not specifically indicate that that it may acquire *health data* obtained from interactions with their *medical providers' websites. Id.* at 794; *see also In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1003–04 (N.D. Cal. 2024) (finding Meta's disclosure that it collects information about activity on third-party websites did not provide reasonable expectation that Meta would collect sensitive *tax information* collected from *tax preparation websites*). On the other hand, collecting information that is only tangentially related to an internet user's health does not, by itself, exceed their reasonable expectation of privacy. In *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd* 745 F. App'x 8 (9th Cir. 2018), this Court found that data showing the plaintiffs searched and viewed publicly available health information was not "qualitatively different" and "sensitive" just because it was health-related, particularly given that the data did not "reveal details of an individual's health status or medical history." *See also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 784–85 (distinguishing *Smith*).

Plaintiffs here allege that LinkedIn collected their private information from third-party websites that provide medical services. Specifically, Plaintiffs allege the following:

- L.B. v. LinkedIn: ReflexMD is an online healthcare operator that offers Semaglutide prescriptions. L.B. Compl. ¶ 35. Customers must complete a survey on the website to determine if they qualify for the medication. *Id.* ¶ 36. The survey asks users to identify their gender at birth, height, weight, and how many pounds they would like to lose. *Id.* ¶¶ 39–40. The survey also asks users to select which goals they are looking to accomplish: "lose weight," "improve general health," "look better," "improve confidence," "increase energy," and/or "better sex." *Id.* ¶ 40. The survey then asks users to select what weight loss methods they have used in the past: "exercise,"

United States District Court
Northern District of California

"dieting," "weight loss supplements," "intermittent fasting," and/or "medical weight loss program." *Id.*

- V.R. v. LinkedIn: CityMD is a provider of healthcare services that allows patients to schedule appointments at CityMD urgent care locations through its website. V.R. Compl. ¶ 38. Patients begin to book their appointment by selecting a date, time, and location. *Id.* ¶ 39–41. They are then asked who is receiving care—"myself," "my child," "my parent," "my spouse," or "other"—and the reason for the visit—"regular urgent case," "employer referred (occupational medicine)," "work related injury," "motor vehicle accident," or "DOT physical." *Id.* ¶ 41. Finally, the user is asked to provide the patient's name, date of birth, and "legal" sex. *Id.*
- J.P. v. LinkedIn: Headway is an online healthcare operator focused on connecting users to the proper therapist or mental health provider. J.P. Compl. ¶ 36. To get connected with care, patients must provide information regarding their location, concerns—specifically asking users to choose "ADD/ADHD," "anger management," "anxiety," "bipolar disorder," etc.—and insurance carrier. *Id.* ¶ 37.
- J.S. v. Spring Fertility: Spring Fertility is a healthcare provider who offers fertility services and treatments. J.S. Compl. ¶ 13. Patients are encouraged to schedule consultations for fertility services on its website. *Id.* ¶ 63. When a patient clicks a "BOOK A CONSULT" button, they are brought to another page and directed to enter various pieces of personal information, including first and last name, date of birth, sex assigned at birth, gender as described in the patient's own words, email, and phone number. *Id.* ¶ 67. The next page asks which state they would like to be seen in, *id.* ¶ 68, then which fertility services they are seeking treatment for: fertility treatment, egg freezing, or embryo freezing, *id.* ¶ 69. The next page requests the patient to identify whether they are in a "heterosexual relationship," "same-sex relationship," or "single parent by choice." *Id.* ¶ 70. The final pages ask more details about booking the appointment, as well as the patient's address, need for an interpreter, partner's name,

United States District Court
Northern District of California

date of birth, email, and phone number, and whether the patient has fertility-specific insurance. *Id.* ¶¶ 71–72.

Defendants argue that Plaintiffs' data here is akin to *Smith* and distinct from the data sent from secured patient portals in *In re Meta Pixel Healthcare*, or the private financial disclosures in *In re Meta Pixel Tax Filing Cases*. The Court disagrees.

The Court finds the data here does not cleanly fall on either end of this spectrum, and therefore this issue is not suitable for resolution in a motion to dismiss. *See Smith v. Google*, LLC, 735 F. Supp. 3d 1188 (N.D. Cal. 2024) (finding factual disputes regarding reasonable expectations and consent inappropriate for a motion to dismiss; *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169 (N.D. Cal. 2024) (same); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1077–78 (N.D. Cal. 2023), *motion to certify appeal denied*, No. 22-CV-03580-WHO, 2024 WL 4375776 (N.D. Cal. Oct. 2, 2024) (same). While Plaintiffs do not allege that their data was taken from a secured patient portal like in *In re Meta Pixel Healthcare*, the personal information here is also not the same "general health information that is accessible to the public at large" in *Smith*. Here, Plaintiffs provided specific information about themselves while in search of medical services. And while some of this information—i.e., name, age, date of birth, weight loss goals—may not be considered medical or private in isolation, the combination of these details and the fact that they were provided in the context of seeking medical services could place the data outside users' reasonable expectations of what LinkedIn collects. This is akin to Plaintiffs' example of a person peering over the front desk in a medical office to read a patient's chart, rather than Defendants' example of seeing a patient walk into a medical office or hearing a patient disclosing some personal information when checking in. Given the nature of this data, the Court finds it inappropriate to determine at this stage whether the information is so sensitive that there is no reasonable expectation it would be disclosed pursuant to LinkedIn's policy as a matter of law.

* * *

Accordingly, at this stage, the Court finds LinkedIn's disclosures are insufficient to show

that Plaintiff consented to the conduct alleged here.[5]

**2. Consent Based on Spring Fertility Disclosures**

As relevant only in J.S.'s case against LinkedIn and Spring Fertility,[6] the Spring Fertility website also contains disclosures that users' data will be shared to third-party websites. J.S. Compl. ¶ 98. When individuals visit the Spring Fertility website, they are presented with a pop-up banner ("Cookie Banner") stating: "Our Website uses Cookies. By continuing to use our site, you are agreeing to our Cookies Policy." Spring Fertility Mot., RJN, Ex. 1. The banner appears as follows:




*Id.*

"Cookies Policy" is underlined and hyperlinks to Spring Fertility's "Legal & Terms." *Id.*, Exs. 1, 2. The "Legal & Terms" page includes Spring Fertility's Privacy Notice, Cookies Policy, and Privacy Policy. *Id.* The Privacy Notice states that Spring Fertility "collect[s] information that identifies, relates to describes, references, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or device." *Id.*, Ex. 2. This "personal

[5] Given the Court's finding, the Court need not examine Plaintiffs' additional arguments regarding the impact of the "lawful" basis term.
[6] As the Court discussed in Section III.A., J.S.'s claims against Meta are severed.

information" explicitly includes identifiers (e.g., name, IP address, email address), personal information (e.g., age, race, marital status, medical condition, gender identity, sexual orientation), biometric information (e.g., genetic, psychological, behavioral, and biological characteristics), internet and network activity (e.g. browsing and search history), professional or employment-related information, non-public education information, and inferences from other personal information (e.g., person's preferences, behavior, aptitudes). *Id.* The Privacy Notice also states that this personal information may be disclosed "to a third party for a business purpose." *Id.*

The Cookies Policy informs users that Spring Fertility "use[s] cookies and similar technologies to help provide, protect, and improve the springfertility.com website." *Id.* The policy also discusses "Targeting Cookies," which it indicates may be set on the Spring Fertility website by its advertising partners to be "used by those companies to build a profile of your interests and show you relevant adverts on other sites." *Id.* Users are provided with information on how to opt-out of this and other data collection technologies. *Id.*

Plaintiff J.S. argues she did not agree to Spring Fertility's Cookies Policy because: (1) she did not have constructive notice of these disclosures, and (2) similar to Plaintiffs' arguments in the section prior, the disclosures were insufficient to inform users of the data collection practices alleged here. The Court will examine each in turn.

**a. Constructive Notice of Disclosures**

For there to be knowing consent to the terms of a contract under California law, there "must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023). The "principle of knowing consent" required to establish contract formation applies with particular force to contracts formed online. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022).

The standard for constructive notice depends on the type of online contract at issue. Contracts formed online are classified "by the way in which the user purportedly gives their assent to be bound by the associated terms" and generally fall on a spectrum ranging from "clickwrap" to

"browsewrap." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1 (2021)); *see also Berman*, 30 F.4th at 856. "[C]lickwrap" agreements are agreements in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating "I agree" in order to proceed. *Berman*, 30 F.4th at 856. Browsewrap agreements, on the other end of the spectrum, are agreements in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website. *Id.* In the middle of the spectrum are sign-in wrap agreements, also known as "modified clickwrap agreement[s]," whereby a user is "notified of the existence of the website's terms of use and advise[d] that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service." *Moyer v. Chegg, Inc.*, No. 22-CV-09123-JSW, 2023 WL 4771181, at *4 (N.D. Cal. July 25, 2023).

The Court finds that the notice here falls somewhere in between a browsewrap and a modified clickwrap agreement—though users are not required to click a button to assent to the terms, they are informed that they assent to the terms by continued use of the website, and users *may* click a button to "ACCEPT" the terms. Cookie banners such as this can still create constructive notice if the terms are reasonably conspicuous. *See Slaten v. Dick's Sporting Goods, Inc.*, No. 2:22-CV-09366-WLH-MAA, 2024 WL 1136399 (C.D. Cal. Feb. 2, 2024) ("'[A]n online agreement falls between these two extremes, courts analyze mutual assent under an objective-reasonableness standard.'") (quoting *Oberstein*, 60 F.4th at 513)).

Reasonably conspicuous notice requires that the notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and if there is a hyperlink, the "the fact that a hyperlink is present must be readily apparent." *Berman*, 30 F.4th at 857.[7] "A web designer must do more than simply underscore the

[7] When evaluating agreements that fall in between clickwraps and browsewraps, courts also generally evaluate the full context of the transaction, including whether the transaction contemplated "a continuing, forward-looking relationship" governed by terms and conditions. *Sellers*, 289 Cal. Rptr. 3d at 16. Neither party raises arguments regarding the context of the

hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text." *Sellers*, 289 Cal. Rptr. 3d at 29. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Berman*, 30 F.4th at 857. For example, in *Berman*, the Ninth Circuit found that two lines of small gray font that stated, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" failed to put the plaintiff on notice of the arbitration provision in part because the underlined terms "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink." *Berman*, 30 F.4th at 856–57. In other cases, courts have found that underlined text is sufficient "when viewed in the context of the overall design and content of the webpage." *Pizarro v. QuinStreet, Inc.*, No. 22-CV-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (finding reasonably conspicuous notice on an underlined hyperlink where (1) the hyperlink appeared "directly below" the action button, (2) the hyperlink was set off by "ample white spacing" and "primarily surrounded by text no larger than the notice itself," and (3) the "general design of the webpage," was "relatively uncluttered and ha[d] a muted, and essentially uniform, color scheme").

The visual placement of the Cookie Banner here could provide sufficient notice of the Cookies Policy and Privacy Notice for several reasons. First, the notice is written in clear font in the middle of the page with a contrasting blue box as a background and no surrounding clutter. The also message clearly informs users in plain language that continued use of the website constitutes acceptance, and though not required, users are notified that they can consent to the policy by clicking a large box with "ACCEPT" written in all caps.[8] Finally, the "Cookies Policy"

transaction. However, the Court observes that, by entering information to book a consult through Spring Fertility's website, it would be reasonable to assume that users contemplate a forward-looking relationship involving continued medical care.

[8] Plaintiff does not challenge the reasonable conspicuousness of the hyperlink in "Cookies Policy."

United States District Court
Northern District of California

hyperlink is underlined and capitalizes the first letter of each word. In the context of the clean and simple format of the page, the Court finds that a reasonably prudent internet user would see the notice and understand that the continued use of the website constitutes agreement to the Cookies Policy, and that "Cookies Policy" is a hyperlink that ultimately leads to the terms of the Cookies Policy and Privacy Notice. *See Ghazizadeh v. Coursera*, Inc., 737 F. Supp. 3d 911, (N.D. Cal. June 20, 2024) (collecting cases).

J.S.'s only argument to the contrary is that she alleged in the complaint the Cookie Banner does not provide constructive notice, and the Court must accept this allegation as true:

> The "cookie banner" on Defendant Spring Fertility's Website does not provide constructive notice of its privacy policy to consumers. The banner is located off to the right of the screen, and users are in no way required to engage with the cookie banner in order to use the Website. Effectively, the banner is non-binding browsewrap. *Price v. Carnival Corp.*, 2024 WL 221437, at *4-5 (S.D. Cal. Jan. 19, 2024) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)).

J.S. Compl. ¶ 98.

The Court accepts as true J.S.'s allegations that the banner is located off to the right of the screen, and users are in no way required to engage with the cookie banner in order to use the website. However, the Court need not accept as true the legal conclusion that the Cookie Banner does not provide constructive notice, and the Court finds this case distinguishable from those cited in the complaint and in J.S.'s opposition.

In *India Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1357 (S.D. Cal. 2024), the plaintiff alleged that "users can interact with Carnival's website without ever reviewing or agreeing to the terms of any purported privacy policy Carnival may have." The court accepted these facts as true and found no constructive notice. *Id.* Whereas here, J.S. alleges that users are not "required to engage with the cookie banner in order to use the website"—but she does not allege that users can use the website without accepting the terms. Indeed, the Cookie Banner clearly informs users that they *cannot* use the website without accepting the terms: "By continuing to use our site, you are agreeing to our Cookie Policies."

J.S.'s reliance on *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014), is similarly unavailing. There, the Barnes and Nobles website contained a hyperlink at the bottom of the page that simply stated: "Terms of Use." *Id.* at 1174. If users clicked on "Terms of Use," they were taken to a page that stated: "By visiting any area in the Barnes & Noble.com Site, creating an account, [or] making a purchase via the Barnes & Noble.com Site . . . a User is deemed to have accepted the Terms of Use." *Id.* Users were never instructed to click Terms of Use or otherwise notified on the Barnes and Nobels website that continued use of the website constituted an agreement to the Terms of Use. *Id.* Although the website made its Terms of Use available, it "otherwise provide[d] no notice to users nor prompt[ed] them to take any affirmative action to demonstrate assent." *Id.* at 1178–79. Given these deficiencies, the Ninth Circuit found that "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* Whereas here, the Cookie Banner clearly states that users agree to the terms of the Cookie Policy by continuing to use the website. It also prompts users to take another affirmative action to demonstrate consent by clicking "ACCEPT." These features distinguish the Cookie Banner from the impermissible browsewrap agreement at issue in *Nguyen*.

The Court therefore finds that J.S. failed to plead facts sufficient to support her allegation that the Cookie Banner "does not provide constructive notice of its privacy policy to consumers."

**b. Specificity of the Disclosures**

The Court also rejects Plaintiffs' second argument that Spring Fertility failed to sufficiently disclose the specific conduct alleged here. Unlike in LinkedIn's disclosures, Spring Fertility's terms are so specific that there can be no reasonable expectation that the information provided to Spring Fertility is private. The Privacy Notice explicitly informs users that Spring Fertility collects users' personal information—including age, race, marital status, medical condition, gender identify, sexual orientation, date of birth, genetic, psychological, behavioral, and biological characteristics, and a user's preferences, behavior, aptitudes—and may disclose this information "to a third party for a business purpose." The Cookies Policy also discloses that

Spring Fertility uses "Targeting Cookies," which it describes as cookies set on its website by advertising partners to build a profile of the user's interests and show the user relevant advertisements on third-party websites.

This is precisely the conduct J.S. alleges here—that Spring Fertility shares personal information (including first and last name, date of birth, sex assigned at birth, gender as described in the patient's own words, email, phone number, treatment sought, relationship status, and insurance provider) to LinkedIn through a form of targeted cookie technology for advertising purposes. Considering the specificity of the disclosures in Spring Fertility's policies, the Court finds J.S. failed to plead facts sufficient to show a reasonable expectation that this data would not be shared.

* * *

The Court therefore **GRANTS** Spring Fertility and LinkedIn's motions to dismiss Plaintiffs' complaint in its entirety in Case No. 24-cv-07374.[9] The Court will continue to examine LinkedIn's motions to dismiss in the remaining cases.

### C. Lack of Intent

Intent is also a foundational requirement for liability under the ECPA, CIPA sections 631 and 632, and invasion of privacy under the California Constitution. To state a claim, Plaintiffs must plausibly allege that LinkedIn's violation of their privacy rights was intentional as opposed to inadvertent. *See United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (the Federal Wiretap Act requires that "the defendant acted intentionally, that is, purposefully and deliberately and not as a result of accident or mistake"); *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 840, 844 (N.D. Cal. 2024) (extending *Christensen*'s analysis of the intent requirement to claims under the ECPA and CIPA, as well as invasion of privacy under the California Constitution). LinkedIn argues Plaintiffs have failed to meet this burden.

[9] Given that consent is an element in each of J.S.'s claims, the Court need not examine remaining arguments regarding whether J.S. sufficiently pled claims under the ECPA, CIPA, CMIA, and California Constitution.

United States District Court
Northern District of California

Plaintiffs allege that "LinkedIn, willfully and without the consent of Plaintiff[s] and Class members, read or attempted to read, or learn the contents or meaning of Plaintiff[s'] and Class members' communications." *E.g.*, J.P. Compl. ¶ 66. This allegation alone is a bare recitation of the intent element for Plaintiffs' privacy claims and is thus not entitled to the presumption of truth afforded to well-pled facts. *Twombly*, 550 U.S. at 570. Plaintiffs do not dispute this and instead contend that other allegations in the complaints support an inference that LinkedIn intended to invade Plaintiffs' privacy. Specifically, Plaintiffs allege that LinkedIn "knew that it intercepted users' interactions on the Website that incorporated [Insight Tag]" (J.P. Compl. ¶ 8), and that the company "intercepted consumers['] confidential information . . . in order to monetize that data for targeted advertising" (*id.* ¶ 40). In other words, Plaintiffs' theory is that LinkedIn's sole purpose for providing the Insight Tag to advertisers is to collect user data and profit from selling advertising services fueled by that data. Plaintiffs allege LinkedIn would be motivated to do so considering the billions of dollars of revenue its advertising business has raised. *See id.* ¶ 15. With this theory in mind, the Court could infer that LinkedIn intentionally invaded Plaintiffs' privacy rights to maintain or increase its high profits.

LinkedIn, however, argues that this inference cannot be squared with its policies to the contrary. In LinkedIn's Ads Agreement, advertisers who use the Insight Tag agree that they "will also not transfer to LinkedIn any data that [the advertiser] know[s] or reasonably should know . . . constitutes Sensitive Data, including by way of installing the Insight Tag on a page that collects medical, financial, or other Sensitive Data about identified or identifiable individuals." J.P. RJN at 9, ECF No. 18-3. And in its Advertising Policies, LinkedIn instructs that "[a]ds must not target based on sensitive data or categories, including . . . data concerning health (including medical information and consumer health data)." J.P. RJN at 7, ECF No. 18-4. LinkedIn contends that these public disclosures of its intent *not* to receive sensitive data are dispositive of the issue.

This is not the first time courts have considered this argument. In *Doe v. Meta Platforms, Inc.*, another privacy case involving tracking pixel technology, Judge Orrick addressed Meta's argument that intent was not sufficiently pled because "Meta seeks to avoid receiving sensitive

information by contractually forbidding developers from sending it and filtering out any potentially sensitive data it detects on the back end." 690 F. Supp. 3d at 1076. The plaintiffs there did not dispute that Meta had this policy but argued that the policy did not reflect Meta's true intentions. *Id.* Judge Orrick agreed and found that intent had been adequately alleged, because "[w]hat Meta's true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measures to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record." *Id.* (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021)). In a similar case against Google, Judge Pitts found the same. *Smith*, 735 F. Supp. 3d at 1198 ("While Google argues that judicially noticeable policy documents suggest that Google did not actually want to receive personally identifiable information and expressly prohibited developers from transmitting such data, this presents a question of fact that the Court cannot resolve at this stage."). Other courts have also found the intent requirement to be a question of fact that is inappropriate to resolve at the pleadings stage. *See Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 859 (W.D. Wash. 2024).

But another recent case took a different tack. In *Doe I v. Google LLC*, Judge Chhabria found that plaintiffs had not sufficiently alleged Google intended to receive private health information through its tracking pixel. 741 F. Supp. 3d at 840. Considering allegations that Google "repeatedly told developers not to send personally identifiable information through use of its source code," and "for health care providers specifically, Google warned that they must not use its source code in ways that would result in HIPAA-covered information being sent to Google," the court found that "Google purposefully acted so as *not* to receive any personal health information." *Id.* Judge Chhabria noted that differences in the allegations could explain his divergence from Judge Orrick's earlier ruling in *Doe v. Meta Platforms, Inc.* *Id.* at 841. However, the court maintained that the specific allegations in *Doe I* were insufficient to plead intent. *Id.* ("But to the extent Judge Orrick's ruling stands for the notion that allegations like the ones in this case are sufficient to plead intent, this Court disagrees. If a plaintiff alleges that the clients of a

source code provider use the code contrary to the provider's instructions, the plaintiff should not be able to get around the intent requirement by simply intoning that the source code provider intended for the clients not to follow instructions.”).

Acknowledging this apparent split in authority, the Court agrees with what is currently the majority rule. That is, the Court declines to hold that LinkedIn’s Ads Agreement and Advertising Policies are entirely dispositive of its intent at the pleadings stage. Plaintiffs’ allegations create a reasonable inference that the purpose of the Insight Tag is for LinkedIn to collect confidential data from users in violation of their privacy rights.[10] Though that inference is relatively weak in light of LinkedIn’s policies to the contrary and the absence of specific facts concerning how LinkedIn uses the data it allegedly receives from the Insight Tag, the question of intent should be considered on a more developed record. Accordingly, Plaintiffs have adequately alleged intent in their complaints.

**D. Choice of Law**

Under California’s choice-of-law rules, “the class action proponent bears the initial burden to show that California has ‘significant contact or significant aggregation of contacts’ to the claims of each class member.” *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (citation omitted). If the class action proponent meets that burden, courts determine whether the interests of other states outweigh California’s via the three-step governmental interest test: (1) whether the relevant law of each affected state differs; (2) whether those differences are material; and (3) if so, which state has a greater interest in application of its laws. *Id.* at 589–90.

Applied here, Plaintiffs must show that the named plaintiffs and putative class members have the requisite contacts with California.[11] LinkedIn contends that they fail to do so in *V.R. v.*

[10] It is worth noting that though Plaintiffs do not specifically allege that LinkedIn’s admonitions to advertisers are false or misleading, that appears to be the inherent implication. Such allegations of fraudulent misrepresentation could trigger the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Doe I*, 741 F. Supp. 3d at 841–42; *but see Smith*, 735 F. Supp. 3d at 1198. However, without allegations of fraud in Plaintiffs’ complaints, the Court need not reach this issue for purposes of this Order.

[11] As an initial matter, Plaintiffs argue choice-of-law considerations are premature at the pleading stage and are better left for class certification. Not so. Though *Mazza* involved a motion for class

*LinkedIn*, Case No. 5:24-cv-07399, especially because named plaintiff V.R. is a New York resident. *See* V.R. Compl. ¶ 7, Case No. 5:24-cv-07399, ECF No. 1. Plaintiff V.R.'s putative class definition, which encompasses "all LinkedIn account holders in the United States who booked a medical appointment on www.citymd.com" (*id.* ¶ 48), does not specify that any putative class member is a California resident. Nor does V.R. allege that the website operator, CityMD, has any presence in California. In fact, judicially noticeable documents show that CityMD only has facilities in New York and New Jersey. V.R. RJN, Case No. 5:24-cv-07399, ECF Nos. 28-7, 28-11. Plaintiffs claim that "[LinkedIn's] decision to reside in California . . . and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible," and "California has significant contacts to the claims of Plaintiff[s]." *Id.* ¶ 58. However, these allegations are recitations of Plaintiffs' choice-of-law burden and amount to little more than conclusions without factual support. And though Plaintiffs argue that LinkedIn, "operating in California, very likely routed and analyzed Plaintiffs' and class members' communications within California" (Case No. 5:24-cv-07399, ECF No. 30 at 13), that theory is not alleged or fleshed out in their complaint. As such, Plaintiffs have not pled the requisite ties to California to invoke CIPA.

It is also unclear at best that California's interest in enforcing CIPA would outweigh the interest of other states in enforcing their own privacy laws. The first two prongs of the governmental interest test are met because "[t]here are material differences between CIPA and the wiretapping statutes of the other 49 states." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 602 (N.D. Cal. 2015); *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-CV-02865-EMC, 2024 WL 1589982, at *12 (N.D. Cal. Apr. 11, 2024). But the third prong weighs against applying California law here. As one court in this District has held, "[b]ecause wiretapping statutes are designed to protect the

---

certification, "the principle articulated in *Mazza* applies generally . . . even when addressing a motion to dismiss." *Frezza v. Google Inc.*, No. 5:12-CV-00237-RMW, 2013 WL 1736788, at *6 (N.D. Cal. Apr. 22, 2013). *Doe*, 690 F. Supp. 3d 1064, which Plaintiffs cite in support, is consistent. There, the court decided that the choice-of-law issue was "*arguably* premature" based on facts and allegations different from the ones here. *Id.* at 1078–79 (emphasis added).

United States District Court
Northern District of California

privacy interests of individual members, the residences of the individuals are more important to the respective sovereign than the residence of the alleged wrongdoer." *Kaiser*, 2024 WL 1589982, at *13. Plaintiffs here fail to plead that they or any putative class member are a California resident. Accordingly, choice-of-law serves as an independent basis for dismissing Plaintiffs' CIPA claims in *V.R. v. LinkedIn*.

### E. CIPA § 631

Plaintiffs premise their Section 631 claims on Clauses Two and Three of CIPA.[12] *E.g.*, J.P. Compl. ¶¶ 62–70. LinkedIn first argues that Plaintiffs' Section 631 claims fail in their entirety because an exception applies. Then, LinkedIn contends that Plaintiffs fail to meet the elements of both Clauses Two and Three and therefore fail to state a claim under either clause. The Court addresses each of these arguments in turn.

#### 1. Party Exception

LinkedIn argues that CIPA's party exception dooms Plaintiffs' Section 631 claims. Under this exception, a party to a conversation by definition cannot be liable for intercepting communications between them. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (holding that CIPA applies "only to eavesdropping by a third party and not to recording by a participant to a conversation") (citation omitted).

LinkedIn argues that it is merely an extension of the websites using the Insight Tag, who were parties to the alleged communications, so LinkedIn is not an eavesdropper. Put differently, LinkedIn argues that it "provides a software service that captures its clients' data . . . and allows the clients to analyze their data," but does not "intercept[] and use[] the data itself." *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021). Plaintiffs do not dispute that it is the website operators, not LinkedIn, who install the Insight Tag on their websites. LinkedIn also represents to advertisers that the Insight Tag is meant to "help *you* optimize *your* campaigns,

---

[12] Plaintiffs' complaints also assert claims under CIPA's first clause, but Plaintiffs confirmed that they were withdrawing this claim during oral argument. *See* Case No. 5:24-cv-07586, ECF No. 33, June 5, 2025 Hr'g Tr. at 72:2–6.

retarget *your* website visitors, and learn more about *your* audiences." *E.g.*, J.P. Compl. ¶ 22 (emphases added). Based on the foregoing, LinkedIn argues that the purpose of the Insight Tag is to support the website operator's advertising efforts and act as an extension of the operators as opposed to a third party. Indeed, many courts in this District have adopted similar reasoning under *Graham* to invoke the party exception and bar CIPA claims. *See, e.g.*, *Doe I*, 741 F. Supp. 3d at 843–44; *Love v. Ladder Fin., Inc.*, 2024 WL 2104497, at *1 (N.D. Cal. May 8, 2024); *Williams v. What If Holdings, LLC*, No. C 22-03780 WHA, 2022 WL 17869275, at *3 (N.D. Cal. Dec. 22, 2022).

Yet, Plaintiffs ask the Court to follow a different line of cases. These cases hold that an analytics provider, like LinkedIn, is not a mere extension of a website operator if the provider has the "capability to use" communications for any other purpose other than supporting the operator. *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023). Here, Plaintiffs allege that LinkedIn uses the data it receives from the Insight Tag "to fuel various services offered by LinkedIn's Marketing Solutions" (J.P. Compl. ¶ 18) and "monetize that data for targeted advertising" (*id.* ¶ 40). *See also id.* ¶ 79. Incorporating allegedly intercepted communications into advertising analytics and selling those services to other customers would certainly qualify as having the "capability to use" the communications independent of supporting the website operator.

However, LinkedIn takes fault with the lack of specificity in Plaintiffs' allegations. To be sure, courts applying *Javier* have required specific factual allegations to support the inference that a vendor independently used the communications. *See, e.g.*, *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 737–738 (N.D. Cal. 2023) (finding allegations that defendant "analyz[ed] the data and provid[ed] [] customer data metrics related to each conversation" insufficient to avoid the party exception); *Valenzuela v. Super Bright LEDs Inc.*, No. EDCV2301148JAKSPX, 2023 WL 8424472, at *8 (C.D. Cal. Nov. 27, 2023) (finding allegation that chat vendor had the "capability to use its record of [w]ebsite users' interaction[s]" for data analytics and marketing/advertising to be "conclusory and insufficient"). These cases demonstrate that allegations detailing how the provider can "use" the intercepted data are sufficient to invoke the party exception. *See Yockey v.*

United States District Court
Northern District of California

*Salesforce, Inc.*, 745 F. Supp. 3d 945 (N.D. Cal. Aug. 16, 2024) (applying *Javier* based on allegations that Salesforce fed chat communications into "Einstein," its "data intelligence platform," to "train the AI models that form the basis of some of [Salesforce's] services"). Conclusory allegations, on the other hand, are not.

Whether Plaintiffs have met the specificity threshold here is a close call. On the one hand, conclusory allegations that a company providing tracking pixel technology profits from the information they gain from that technology are insufficient to meet the relevant pleading standard. But requiring too much specificity as to LinkedIn's use of confidential information would place an undue burden on Plaintiffs to plead facts particularly within LinkedIn's knowledge and thus would doom potentially viable claims at the early pleading stage. To strike the correct balance, the Court is guided by another case involving a Section 631 claim related to LinkedIn's Insight Tag. In *Jackson v. LinkedIn Corp.*, Judge Pitts found that allegations strikingly similar to the ones here were enough to disqualify LinkedIn from invoking the party exception. 744 F. Supp. 3d 986, 994 (N.D. Cal. 2024). Though such allegations "may very well be insufficient to plausibly suggest LinkedIn's *use* of the [allegedly intercepted] information," Judge Pitts did not see that as necessarily taking the case out of the scope of *Javier*. *Id.* *Javier*'s exception to the party exception applies when a plaintiff alleges the alleged interceptor has the "*capability* to use" the intercepted information, not that it actually uses it. Plaintiffs here have sufficiently alleged that LinkedIn can and does use the allegedly intercepted information to fuel its Marketing Solutions services and enable advertisers to reach targeted audiences.

Accordingly, the party exception does not preclude CIPA liability here.

**2. Clause Two**

A person violates Clause Two if she "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." Cal. Penal Code § 631(a). So, to state a claim under Clause Two, Plaintiffs must plausibly allege that

United States District Court
Northern District of California

several elements are met. LinkedIn contends that Plaintiffs have not met their burden as to three of those elements—*i.e.*, that LinkedIn: (1) "read or attempted to read," their "communications,"[13] (2) while those communications were "in transit," that (3) it did so "willfully." Further, LinkedIn argues that Plaintiffs L.B. and V.R. fail to allege that LinkedIn intercepted any communications were "sent from, or received" in California.

**a. Read or Attempting to Read**

Plaintiffs must allege that LinkedIn at least attempted to read or learn the contents of communications between Plaintiffs and the websites at issue. LinkedIn argues that the complaints' allegations are too conclusory and non-specific to meet that standard. To be sure, Plaintiffs' allegations that LinkedIn "read, or attempted to read, or learn the contents of [their] communications to [the websites]" are conclusory recitations of an element of the Clause-Two claim, so they are not entitled to a presumption of truth. *E.g.* J.P. Compl. ¶ 66; *see Twombly*, 550 U.S. at 570. But Plaintiffs counter that LinkedIn organized their communications data into metrics to be used for advertising, and one may reasonably infer that LinkedIn read the contents of Plaintiffs' communications during that process. *See, e.g.*, J.P. Compl. ¶¶ 17 ("As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more."), 18 ("The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions . . . ."). While it is reasonable to infer that LinkedIn uses the data it receives from the Insight Tag for its advertising services, it is not entirely clear where in that process LinkedIn would read, attempt to read, or learn the contents of Plaintiffs' communications. Plaintiffs do not plead any facts that create a "coherent story" of how LinkedIn read the specific communications between them and the websites they visited. *See Love*, 2024 WL 2104497, at *2 (rejecting as insufficient allegations that

---

[13] LinkedIn also argues that Plaintiffs fail to allege that LinkedIn intercepted "communications," as required by both Sections 631 and 632 of CIPA. The Court addresses that element *infra* Section III.F.3.

created "no coherent story of how or why [the defendant] would learn such granular information about users [of] one of its customers' sites"). For example, Plaintiffs do not allege that they received any targeted advertising after interacting with the challenged websites, a fact that would strengthen the inference that LinkedIn learned about Plaintiffs from reading their communications. Exacting detail of LinkedIn's data processing is not necessary to survive dismissal under Rule 12(b)(6). However, Plaintiffs must plead additional facts to support the inference that LinkedIn specifically read, attempted to read, or learned the contents of Plaintiffs' communications when using such information to fuel their advertising analytics. Plaintiffs have not done so in their complaints.

**b. In Transit**

To meet the "in transit" requirement, Plaintiffs must allege that LinkedIn read their communications during their transmission, as opposed to once the communications were placed in electronic storage. *Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112, 1125 (C.D. Cal. 2024). That is, they must plead specific facts about "*when* the interception occurs." *Swarts*, 689 F. Supp. 3d at 746 (N.D. Cal. 2023). Plaintiffs need not prove their theory of interception to survive dismissal, but they must "provide fair notice to [LinkedIn] of when they believe [LinkedIn] intercepts their communications." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1228 (C.D. Cal. 2017); *see also Esparza v. Gen Digital Inc.*, No. CV 23-8223-KK-AGRX, 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024) (dismissing CIPA claims where "Plaintiff fail[ed] to allege specific facts about . . . when the interception took place, and how the interception took place").

Here, Plaintiffs argue LinkedIn intercepted communications with the websites in "real time," or at the time users input said communications into the websites. *E.g.*, Case No. 5:24-cv-07586, ECF No. 21 at 15. Notably, however, they do not explicitly allege this "real time" theory in their complaints. Instead, Plaintiffs generally allege that the Insight Tag sends LinkedIn data "[w]hen a user who has signed in to LinkedIn . . . is browsing a website" (*e.g.*, J.P. Compl. ¶¶ 23–26) and that LinkedIn begins "tracking their activity the moment they entered [the websites]" (*id.*

United States District Court
Northern District of California

¶¶ 38–45). Without more specificity, these allegations do not provide fair notice of exactly when or how LinkedIn intercepted the communications and are therefore insufficient to plausibly plead that LinkedIn intercepted communications while "in transit." As such, the "in transit" requirement is another basis for dismissing Plaintiffs' Clause Two claims.

**c. Sent or Received Within California**

Plaintiffs must also allege that their communications with the websites were sent from or received within California. As explained above when addressing choice-of-law issues, Plaintiff V.R. does not satisfy this requirement. *See supra* Section III.D. Plaintiff L.B.'s complaint suffers from a similar deficiency. L.B. is domiciled in Florida and does not allege that the challenged website, ReflexMD, has any presence in California. Case No. 5:24-cv-06832, ECF No. 1 ¶ 5.

L.B. and V.R. attempt to bypass this geographical requirement by arguing that Clause Two applies disjunctively, so Plaintiffs need only satisfy the "in transit" requirement *or* the "sent or received" requirement. Plaintiffs are incorrect. Such a reading would mean that CIPA's second clause applies to all communications anywhere in the world, so long as they are intercepted "in transit." That cannot be the case for a California state statute intended to protect California citizens. *See* Cal. Penal Code § 630 (stating that CIPA "intends to protect the right of privacy of the people of [California]"). The more plausible interpretation is that each of the elements of Clause Two are conjunctive and must independently satisfied to state a claim under Clause Two. *See, e.g.*, *Valenzuela v. Super Bright*, 2023 WL 8424472, at *10 (C.D. Cal. Nov. 27, 2023). Because L.B. or V.R. do not allege that they sent or that the websites received any communications in California, their Clause-Two claims fail.

**d. Willful**

The Court addressed the issue of intent or willfulness above. *See supra* Section III.C. Because Plaintiffs have sufficiently alleged intent, the willfulness element is not a basis to dismiss Plaintiffs' Clause Two claims.

* * *

In sum, Plaintiffs' allegations do not satisfy the "read or attempting to read" or the "in

transit" requirement of CIPA § 631's second clause. Plaintiffs L.B. and V.R. also fail to meet the "sent or received within California" element. Consequently, the Court **GRANTS** LinkedIn's motion to dismiss Plaintiffs' claims under Clause Two of CIPA § 631 with leave to amend.

**3. Clause Three**

To plead a valid Clause-Three claim, Plaintiffs must allege "a violation of the first or second clauses." *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d at 827. For the reasons set forth above, Plaintiffs have not done so. As such, the Court **GRANTS** LinkedIn's motion to dismiss Plaintiffs' claims under Clause Three of CIPA § 631 with leave to amend.

**F. CIPA § 632**

Section 632 makes it unlawful to "intentionally and without the consent of all parties to a confidential communication, use[] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication." Intent and consent are discussed above, but the parties also dispute whether: (1) software such as the Insight Tag is a "device"; (2) the information was "confidential"; and (3) the transmission of data is a "communication."

**1. Device**

This Court recently found in *Libman v. Apple, Inc.*, No. 22-CV-07069-EJD, 2024 WL 4314791, at *13 (N.D. Cal. Sep. 26, 2024), that software is a "device" under Section 632, relying on *Doe*, 690 F. Supp. 3d 1064, and *Yockey*, 745 F. Supp. 3d 945. LinkedIn acknowledges this decision, but argues that the Court should "freshly consider this issue" in light of three cases: *Doe v. Microsoft Corp.*, No. C23-0718-JCC, 2023 WL 8780879, at *8 (W.D. Wash. Dec. 19, 2023); *In re Google Location History Litig.*, 428 F. Supp. 3d 185 (N.D. Cal. 2019) (Davila, J.); and *Moreno v. San Francisco Bay Area Rapid Transit Dist.*, No. 17-CV-02911-JSC, 2017 WL 6387764 (N.D. Cal. Dec. 14, 2017).

As an initial matter, these three cases were decided before the Court issued its opinion in *Libman*—there are no new cases to persuade the Court to "freshly" consider the issue. But further, each case is distinguishable from the facts and claims here. This Court in *In re Google Location History Litigation* found that location tracking software is not a "device" under CIPA section

637.7—not Section 632. *In re Google Location History Litig.*, 428 F. Supp. 3d at 195. Section 637.7 pertains only to electronic tracking devices and explicitly defines an "electronic tracking device" as "any device attached to a vehicle or other movable thing that reveals its location or movement by the transmission of electronic signals." *Id.* at 192 (quoting CIPA § 637.7). The Court found location tracking software did not meet this definition. *Id.* at 195. This decision has no bearing on the issue here. Similarly, Judge Corely in *Moreno* found that an "electronic tracking device," for purposes of Section 637.7, did not include "software installed in mobile devices." *Moreno*, 2017 WL 6387764, at *5. The only case finding software is not a device for purposes of Section 632 is *Doe*, 2023 WL 8780879, at *8, where the district court relies on this Court's decision in *In re Google Location History* and applies it to Section 632 without further examination.

Therefore, consistent with its recent *Libman* decision, the Court finds the software in this case qualifies as a "device" for purposes of Section 632.

**2. Confidential**

"A communication is confidential under Section 632 if a party 'has an objectively reasonable expectation that the conversation is not being overheard or recorded.'" *Swarts*, 689 F. Supp. 3d at 746. Because online "communications can easily be shared by, for instance, the recipient(s) of the communications," "California appeals courts have generally found that Internet-based communications are not 'confidential' within the meaning of [S]ection 632." *Id.* at 746–47 (quoting *Campbell*, 77 F. Supp. 3d at 849) (collecting cases). There is generally a "'presumption' that such communications do not give rise to the requisite expectation." *Id.* at 747 (quoting *Revitch v. New Moosejaw, Inc., LLC*, No. 18-CV-06827-VC, 2019 WL 5485330, at *3 (N.D. Cal. Oct. 23, 2019)).

The Court declines to decide this issue in the pleadings stage. While internet-based communications are generally not "confidential" for purposes of Section 632, "[c]ommunications made in the context of a patient–medical provider relationship are readily distinguishable from online communications in general." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 799.

United States District Court
Northern District of California

As discussed in its examination of consent in Section III.C., the Court recognizes that the information allegedly shared here may not be as sensitive as the health-related data in *In re Meta Pixel Healthcare Litig.* The data sharing here occurred pre-services outside of a secured patient portal. However, while Plaintiffs may not have been communicating directly with medical care providers, they were still providing personal information in search of medical services. This could at least support a reasonable expectation that this information will be kept confidential.

The Court therefore finds Plaintiffs pled facts sufficient to satisfy this element.

**3. Communication**

Finally, though Defendants initially argued that the transmission of data here was not a "communication," citing to a Massachusetts Supreme Court decision interpreting a similar Massachusetts state law, Defendants dropped the issue after Plaintiffs highlighted that the Ninth Circuit has already found the CIPA "applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).

Accordingly, pursuant to *Javier*, the Court finds Plaintiffs sufficiently pled this element.

* * *

Therefore, the Court **DENIES** Defendants' motions to dismiss Plaintiffs' Section 632 claims.

**G. California Constitutional Invasion of Privacy**

To state a claim for invasion of privacy under the California Constitution, plaintiffs "must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious . . . as to constitute an egregious breach of the social norms' such that the breach is 'highly offensive.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601 (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)).

**1. Protected Privacy Interest and Reasonable Expectation**

Regarding the first two elements, the parties largely reiterate the arguments examined above regarding confidentiality and consent. For the same reasons as those discussed in Sections

III.B.1.b. and III.F.3., the Court finds Plaintiffs have sufficiently pled a protected privacy interest and reasonable expectation of privacy.

**2. Highly Offensive Behavior**

"Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 37 (1994). To count as "highly offensive," an intrusion must constitute an "egregious breach of the social norms underlying the privacy right." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (quoting *Hill*, 7 Cal. 4th at 26, 37). This standard requires more than mere disclosure of personal information. *Ojeda v. Kaiser Permanente Int'l, Inc.*, 2022 WL 18228249, at *6 (C.D. Cal. Nov. 29, 2022) (disclosure of Covid vaccination status, though politically fraught, was not highly offensive on facts alleged). Courts analyzing whether a plaintiff alleges a highly offensive intrusion undertake a holistic consideration of "factors such as the likelihood of serious harm to the victim, the degree and setting of the intrusion, [and] the intruder's motives and objectives[.]" *See, e.g., Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1126 (S.D. Cal. 2023); *Hammerling*, 2022 WL 17365255, at *8. While the reasonable expectation of privacy analysis primarily focuses on the nature of the intrusion, the highly offensive analysis focuses on the degree to which the intrusion is unacceptable as a matter of public policy. *Hernandez*, 47 Cal. 4th at 287 (noting that highly offensive analysis "essentially involves a 'policy' determination as to whether the alleged intrusion is highly offensive under the particular circumstances").

Courts have found unauthorized data sharing could possibly constitute a "highly offensive" intrusion in certain circumstances. For example, *In re Facebook Internet Tracking Litigation* and *In re Google Location History Litigation*, the Ninth Circuit and this Court held that systemic location tracking while users had the location tracking settings turned off could constitute an egregious breach of societal norms, and the issue was therefore inappropriate for a motion to dismiss. *In re Google Location History Litig.*, 514 F. Supp. 3d at 1157 ("Whether Google's collection and storage of location data when Location History was set to off was highly offensive

to a reasonable person is a question of fact.") (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 ("The ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage.")). On the other hand, courts have also found as a matter of law that certain data sharing practices do not rise to the level of highly offensive conduct. For example, in *In re iPhone Application Litigation*, the court found that permitting third-party application developers to access personally identifying information from users' devices, including in some cases location data, did not rise to the level of highly offensive conduct. *In re iPhone Application Litigation*, 844 F. Supp. 2d at 1049–50. Similarly, in *In re Google Inc. Privacy Policy Litigation*, the court found no highly offensive conduct in allegations that Google surreptitiously tracked users' browsing data while using Google's services. *In re Google, Inc. Privacy Policy Litigation*, 58 F. Supp. 3d 968, 987–88 (N.D. Cal. 2014). And in *Ojeda v. Kaiser Permanente Int'l, Inc.*, the court found the disclosure of vaccination status not "highly offensive." *Ojeda*, 2022 WL 18228249, at *6.

Again here, the Court finds that the allegations in this case do not fit squarely into any of the cases cited above. LinkedIn's conduct may not be the same egregious systematic tracking and misrepresentations at issue in *In re Facebook Internet Tracking Litigation* and *In re Google Location History Litigation*; but the data here is medically-related and arguably more sensitive than the data at issue in *In re iPhone Application Litigation* and *In re Google Inc. Privacy Policy Litigation*. The only case relatively closer to the facts here is *Ojeda*, where the court found the disclosure of vaccination status was not "highly offensive"; but the Court is not bound to follow this decision. Given the nature of LinkedIn's alleged conduct and the sensitivity of the information shared here, the Court finds this issue is also inappropriate to resolve at the pleadings stage.

Accordingly, the Court finds Plaintiffs sufficiently pled "highly offensive" conduct.

* * *

The Court therefore **DENIES** LinkedIn's motions to dismiss Plaintiffs' claims for invasion of privacy under the California Constitution.

## IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

- The Court **GRANTS** Meta's motion to sever J.S.'s claims against it in Case No. 24-cv-07374. J.S.'s claims against Meta shall be related to and consolidated with *In re Meta Pixel Healthcare Litig.*, Case No. 3:22-cv-03580-WHO (N.D. Cal. June 17, 2022). J.S.'s claims against LinkedIn and Spring Fertility remain before this Court.
- The Court **GRANTS** LinkedIn and Spring Fertility's motions to dismiss all claims in Case No. 24-cv-07374 with leave to amend.
- The Court **GRANTS** LinkedIn's motion to dismiss the CIPA §§ 631, 632 claims with leave to amend and **DENIES** LinkedIn's motion to dismiss the California constitutional privacy claim in Case No. 24-cv-07399.
- The Court **GRANTS** LinkedIn's motions to dismiss the CIPA § 631 claims with leave to amend and **DENIES** LinkedIn's motions to dismiss the CIPA § 632 claims and California constitutional privacy claims in Case Nos. 24-cv-06842 and 24-cv-07586.

Given the obvious and substantial overlaps in facts and law, the Court **SETS** a status conference for **October 23, 2025,** to discuss consolidating the cases discussed in this Order. The parties shall file a Joint Status Report indicating their positions on consolidation and a Proposed Order of Consolidation by **4:00 p.m. on October 15, 2025**. The Court will set an amended pleadings deadline following the status conference.

**IT IS SO ORDERED.**

Dated: October 10, 2025

EDWARD J. DAVILA
United States District Judge

---

[*] This Order amends the Court's original order by clarifying the dismissal of both CIPA § 631 and CIPA § 632 claims in Case No. 24-cv-07399.