**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

J.S., individually and on behalf of all others similarly situated,

Plaintiff,

v.

SPRING FERTILITY HOLDINGS, LLC,

Defendant.

Case No. 5:24-cv-07374-EJD

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Deleted: META PLATFORMS, INC., AND LINKEDIN CORPORATION,…

Deleted: Defendants

Plaintiff J.S. ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant Spring Fertility Holdings, LLC ("Spring Fertility" or "Defendant"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

Deleted: Defendants

Deleted: "), Meta Platforms, Inc. ("Facebook")[1], and LinkedIn Corporation ("LinkedIn") (together with Spring Fertility and Facebook, "Defendants

## NATURE OF THE ACTION

1. This is a class action brought on behalf of all patients who accessed and used www.springfertility.com (the "Website") to book a consultation for fertility services.

2. Seeking fertility treatments often represents a deeply personal and emotionally taxing journey. The process can be fraught with physical discomfort, uncertainty, and a range of emotional responses, from hope and excitement to frustration and despair. The constant cycle of anticipation and disappointment can be emotionally exhausting, as patients grapple with the pressures of both medical outcomes and societal expectations.

3. Given these challenges, maintaining patient privacy is paramount. Fertility treatments are inherently personal, involving intimate details about an individual's health, reproductive choices, and, often, their sexual orientation. The desire for privacy stems not only from the sensitivity of the medical information, but also from the emotional vulnerability that accompanies the process.

4. When seeking fertility treatment patients expect that their healthcare providers will maintain strict confidentiality and uphold the trust and respect that patients expect and need during such a vulnerable time.

5. Defendant knows this, promising its patients that "everything [] we do at each of our locations is focused on putting patients' needs first[.]"[2] Despite that promise, Defendant aided, employed, agreed, and conspired with social media websites Meta Platforms, Inc. ("Facebook") and LinkedIn Corporation ("LinkedIn") to intercept sensitive and confidential personal and medical communications sent by patients seeking to book services with Spring Fertility through its website. This was a serious invasion of privacy divulging deeply personal aspects of an

Deleted: Spring Fertility

Deleted: Spring Fertility

[2] SPRING FERTILITY, https://springfertility.com/

Deleted:

Deleted: ¶

individual's life. The interception of communications was particularly egregious because it included highly sensitive details including the specific type of fertility treatment sought, all without the patients' knowledge or consent.

6. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

**PARTIES**

7. Plaintiff J.S. is a California citizen who resides in Oakland, California. Plaintiff was in California when she booked a consultation for fertility services using the Website.

8. Plaintiff attended her consultation and received fertility services related to IVF treatment from Defendant Spring Fertility.

9. During the time Plaintiff used the Website, she maintained social media accounts with Facebook and LinkedIn. Plaintiff used the same device to access the Website and her Facebook and LinkedIn accounts. Subsequently, as a result of the conduct of Defendant, she received targeted advertisements on Facebook and LinkedIn relating to fertility services.

10. Pursuant to the systematic process described herein, Spring Fertility assisted Facebook and LinkedIn with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII"), protected health information (or "PHI"). This includes information related to the specific fertility treatment she received with Spring Fertility. Defendant Spring Fertility assisted Facebook and LinkedIn's interceptions without Plaintiff's knowledge, consent, or express written authorization.

11. By failing to receive the requisite consent, Spring Fertility breached its duty of confidentiality and aided Facebook and LinkedIn in unlawfully intercepting Plaintiff's PII and PHI.

12. Such acts are egregious violations of Plaintiff's right to privacy.

13. Defendant Spring Fertility Holdings, LLC is incorporated in Delaware with its principal place of business in San Francisco, California. Defendant Spring Fertility owns and operates the Website www.springfertility.com. Defendant Spring Fertility provides fertility services and treatments for consumers.[3] Defendant Spring Fertility embedded tracking software

[3] SPRING FERTILITY, https://springfertility.com/resources-faq/#infertility-faq.

**Deleted:** and booking information

**Deleted:** such as

**Deleted:** and the patient's sexual orientation

**Deleted:** Defendants

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

known as the Facebook Tracking Pixel and LinkedIn Insight Tag on its Website, as described in more detail below. Defendant Spring Fertility embedded these tracking technologies on its Website for advertising purposes.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

15. This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court. Further, Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California. Additionally, Plaintiff, while in California, booked a consultation for fertility services at one of Defendant Spring Fertility's California locations using the Website.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

**A. Background of the California Information Privacy Act ("CIPA")**

17. The CIPA, California Penal Code Section 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

**Deleted:** <#>Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located in Menlo Park, California. Defendant Facebook at all times knew that the incorporation of its software into the Spring Fertility Website would result in its interception of PHI and other sensitive data. Defendant Facebook, as the creator of its software and the Facebook Tracking Pixel, knew that it intercepted each of a users' interactions on the Website that incorporated its technology. Defendant Facebook has consistently come under scrutiny for incorporating its technology on websites that involve the transmittal of sensitive data, including health information, but continues to do so. Defendant Facebook intends to intercept this sensitive data and health information due to the value it holds for targeted advertising.¶
Defendant LinkedIn Corporation is a Delaware corporation with its principal place of business located in Sunnyvale, California. Defendant LinkedIn at all times knew that the incorporation of its software into the Spring Fertility Website would result in its interception of PHI and other sensitive data. Defendant LinkedIn, as the creator of its software and the LinkedIn Insight Tag, knew that it intercepted each of a users' interactions on the Website that incorporated its technology. Defendant LinkedIn is well aware of the dangers of incorporating such technology on websites that offer medical services, but continues to do so. Defendant Linkedin intends to intercept this sensitive data and health information due to the value it holds for targeted advertising.¶

**Deleted:** Defendants have

**Deleted:** themselves

**Deleted:** Defendants transact

**Deleted:** Defendants reside

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

18. To establish liability under California Penal Code Section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, or contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable, or is being sent from, or received at any place within this state,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (the CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (the CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607–08 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

20. Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation under the CIPA. Cal. Penal Code § 637.2.

**B. Background of the California Confidentiality of Medical Information Act ("CMIA")**

21. Under the CMIA a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).[4] "An authorization for the release of medical information . . . shall be valid if it:

> (1) Is handwritten or is in a typeface no smaller than 14-point type.
>
> (2) Is clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization.
>
> (3) Is signed . . . and dated . . .
>
> (4) States the specific uses and limitations on the types of medical information to be disclosed.
>
> (5) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.
>
> (6) States the name or functions of the persons or entities authorized to receive the medical information.
>
> (7) States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.
>
> (8) States an expiration date or event . . . .
>
> (9) Advises the person signing the authorization of the right to receive a copy of the authorization."[5]

22. Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and PHI. Cal. Civ. Code § 56.36(c).[6] Similarly, if a negligent release occurs and

---

[4] Subdivisions (b) and (c) are not relevant to this case but permit the disclosure of medical information in situations where a government investigation or lawsuit is taking place. For example, Defendant Spring Fertility could bypass the authorization requirement if patient medical information was requested pursuant to a lawful court order or by a party to a proceeding before a court or administrative agency pursuant to a subpoena. *See* Cal. Civ. Code §§ 56.10(b)(3) & 56.10(b)(6).

[5] Cal. Civ. Code § 56.11(b).

[6] "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101(a).

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages to sue. Cal. Civ. Code § 56.36(b). The California Third District Court of Appeal emphasized this in *Sutter Health*:

> In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) . . . nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient.[7]

**C. Health Information Is Sensitive And Confidential**

23. Defendant assisted Facebook and LinkedIn, two of the largest data and technology companies in the world, with intercepting information that is sensitive, confidential, and personally identifiable.

24. Under federal law, a healthcare provider may not disclose personally identifiable information ("PII") or protected health information ("PHI") without the patient's express written authorization.[8] In this case, PHI includes, but is not necessarily limited to, information pertaining to fertility treatment.

25. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[9]

---

[7] *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551 (2014) (quoting Cal. Civ. Code § 56.36(b)).

[8] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[9] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

Formatted: Indent: Left: 1", Right: 1"

Deleted: Defendant

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

26. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[10]

27. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization." *Id.*

28. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it knowingly disclosed individually identifiable health information relating to its patients.

29. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

[10] 42 U.S.C. § 1320d-6.



Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

30. Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[11]

31. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[12]

32. Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendant's unlawful conduct resulted in third parties intercepting information

[11] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[12] *Id.* (emphasis added).

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

regarding Plaintiff and Class Members' fertility appointments and treatments on Defendant's Website.

33. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code.[13]

34. Crucially, the Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care.[14]

35. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The

[13] *Id.* (emphasis added).

[14] *Id.* (emphasis added).



Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

> FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.[15]

36. The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, BetterHelp, GoodRx, and Premom make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

---

[15] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).



Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[16]

37. Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**D. Facebook's Platform and Business Tools**

38. Facebook describes itself as a "real identity platform,"[17] meaning users are allowed only one account and must share "the name they go by in everyday life."[18] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[19]

39. In 2023, Facebook generated over $134 billion in revenue.[20] With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[21]

40. Facebook sells advertising space by highlighting its ability to target users.[22] Facebook can target users effectively because it surveils user activity on and off its site.[23] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their

---

[16] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

[17] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL ST. J. (Oct. 21, 2021, 4:05 PM), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[18] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[19] FACEBOOK, SIGN UP, https://www.facebook.com.

[20] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend-2024.pdf at 8.

[21] *Id.*

[22] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[23] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

"interests," "behavior," and "connections."[24] Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[25]

41. Advertisers can also build "Custom Audiences."[26] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[27] With Custom Audiences, advertisers can target existing customers directly and build "Lookalike Audiences," which "leverage[] information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[28] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: (1) by manually uploading contact information for customers or (2) by utilizing Facebook's "Business Tools."[29]

42. As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[30] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

43. The Business Tools are automatically configured to capture certain data, like when a

[24] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[25] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[26] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[27] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[28] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[29] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[30] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[31] Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[32] Advertisers can even create their own tracking parameters by building a "custom event."[33]

44. One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Spring Fertility, to integrate into their website. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[34] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers. This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

45. Defendant chose to include the Facebook Tracking Pixel on its Website.

46. Facebook's own documentation makes clear how extensively the Facebook Tracking Pixel tracks private information. It describes the Facebook Tracking Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the

[31] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[32] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[33] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[34] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

right people[] [and] ***[f]ind . . . people who have visited a specific page or taken a desired action on your website***" (emphasis added).[35]

47. Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone takes an action on your website***. Examples of actions include adding an item to their shopping cart or making a purchase. ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. ***You'll also have options to reach those customers again through future Meta ads***.[36]

48. Of course, in healthcare, it is medical specialists that users "add to their shopping cart." They book fertility consultations rather than make purchases.

49. The Facebook Tracking Pixel code enables Facebook not only to help Defendant with advertising to its own patients outside the Website, but also includes individual patients among groups targeted by ***other*** Facebook advertisers relating to the conditions about which patients communicated on Defendant's Website.

50. Facebook's Business Help Center explains:

> Meta ***uses event data to show ads to people who are likely to be interested in them***. One type of marketing data is website events, which are ***actions that people take on your website***.[37]

51. In other words, Facebook sells advertising space by highlighting its ability to target users.[38] Facebook can target users so effectively because it surveils user activity both on and off its site.[39] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and connections.[40]

52. An example illustrates how the Facebook Tracking Pixel works. Take an individual who, at relevant times, navigated to Defendant's Website and clicked on a link to book a fertility

---

[35] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[36] *Id.* (emphasis added).

[37] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[38] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited May 21, 2024).

[39] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[40] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

consultation. When that link was clicked, the individual's browser sent a GET request to Defendant's server requesting that server to load the particular webpage. As a result of Defendant's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening. Facebook caused the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

53. After collecting and intercepting the information described in the preceding paragraph, Facebook processed, analyzed, and assimilated it into datasets like Core Audiences and Custom Audiences.

**E. LinkedIn's Platform and Business Tools**

54. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[41] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[42] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[43]

55. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [44] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end,

---

[41] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[42] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[43] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[44] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

Deleted: Defendant

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[45] LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[46]

56. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[47]

57. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[48]

58. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[49]

---

[45] LINKEDIN, *supra* note 33.

[46] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[47] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[48] *See id.*

[49] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

59. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[50] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[51]

60. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[52] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[53]

61. According to LinkedIn, the LinkedIn Insight Tag, also called the Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[54] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[55]

62. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[56] A critical feature allows the LinkedIn Insight Tag to

[50] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[51] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[52] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[53] Dencheva, *supra* note 34.

[54] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[55] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[56] LINKEDIN, *supra* note 45.

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

track users, even when third-party cookies are blocked.[57] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[58] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its Pixel.[59] Instead, the LinkedIn Pixel is shielded with the same privacy exemptions offered to first-party cookies.

63. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

64. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

65. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[60]

66. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[61] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[62]

67. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Pixel, Defendant LinkedIn is able to target its account holders for advertising.

---

[57] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[58] *See id.*

[59] *See id.*

[60] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[61] *See id.*

[62] *See id.*

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

68. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information. In fact, LinkedIn expressly warrants the opposite.

69. When first signing up, a user agrees to the User Agreement.[63] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[64] and the Cookie Policy.[65] For California residents, LinkedIn also publishes a California Privacy Disclosure.[66]

70. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[67]

71. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[68] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[69]

72. However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[70]

73. Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive and unlawfully disclosed information in violation of state and federal privacy laws.

---

[63] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[64] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[65] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[66] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

[67] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[68] *Id.*

[69] *Id.*

[70] *Id.* (emphasis added).

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

74. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**F. How Defendant Spring Fertility Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted with Intercepting Communications**

75. Defendant Spring Fertility is a corporation that focuses on providing fertility services, such as in vitro fertilization ("IVF").

76. Spring Fertility owns and operates the www.springfertility.com Website, where it encourages prospective patients to schedule consultations for its fertility services.

77. At all relevant times Defendant Spring Fertility's Website utilized the Facebook Tracking Pixel and LinkedIn Insight Tag.

78. Through the Facebook Tracking Pixel and LinkedIn Insight Tag, Defendant Spring Fertility shared its patients' identities and online activity, including information related to consumers seeking to procure fertility treatment, with two of the world's largest social media companies for targeted advertising purposes.

79. Defendant Spring Fertility allows and encourages consumers to book consultations for fertility treatment on its Website.

**<u>Figure 1</u>:**




80. Once a consumer clicks the "BOOK A CONSULT" link, they are brought to the following webpage to provide additional personal information to Defendant Spring Fertility.

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

**Figure 2:**




81. When a consumer fills out the requested information and clicks "NEXT," they are taken to another webpage where Defendant Spring Fertility asks about the State they would like to receive services.

**Figure 3:**




82. On the following page, consumers indicate the fertility services they are seeking treatment for.

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

**Figure 4:**




83. Next, Defendant Spring Fertility requests that consumers identify the type of relationship they are in, including whether they are in a "[s]ame-sex [r]elationship" or a "[s]ingle [p]arent by [c]hoice."

**Figure 5:**




Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

84. Defendant Spring Fertility next asks a host of questions related to a consumers preferred treatment location.

**Figures 6-8:**










Deleted: <object>

Deleted: ¶

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

85. Finally, Defendant Spring Fertility requests more personal information, including contact information, personal information related to a consumer's partner, and insurance information.

**Figures 9-12:**










86. When a consumer enters Defendant Spring Fertility's Website and begins the process of booking a fertility consultation, Defendant Spring Fertility transmitted the fact that the consumer was seeking to procure fertility treatment to Facebook and LinkedIn through the Facebook Tracking Pixel and LinkedIn Insight Tag.

**Deleted:** <object><object><object>

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

87. For example, Defendant Spring Fertility incorporated the Facebook Tracking Pixel on its Website, allowing Defendant Facebook to intercept and record "PageView" and "SubscribedButtonClick" events, which detail information about which page on Defendant Spring Fertility's Website the patient was viewing as well as the selections they were making.

88. Specifically, when booking a fertility consultation for IVF treatment, the PageView and SubscribedButtonClick event information shared with Facebook includes the terms "springfertility," "book-a-consult," and "IVF." *See* Figures 13 and 14.

**<u>Figures 13-14:</u>**

Facebook
Endpoint:https://www.facebook.com
Data:
id 684212726404517
ev PageView
dl https://springfertility.com/book-a-consult-contact/?r=CA#gf_38
rl https://springfertility.com/book-a-consult/

Facebook
Endpoint:https://www.facebook.com
Data:
id 684212726404517
ev SubscribedButtonClick
dl https://springfertility.com/book-a-consult-location/?rel=H&int=IVF&r=CA&feid=40-255969#gf_40
rl https://springfertility.com/book-a-consult-goals/?r=CA&feid=39-255967

89. Each time Defendant Spring Fertility sent this activity data through the Facebook Tracking Pixel, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

90. A user who accessed Defendant Spring Fertility's Website while logged into

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted FID.

91. When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

92. One such cookie was the "fr cookie" which contained, at least, an encrypted FID and browser identifier.[71] Facebook, at a minimum, used the fr cookie to identify users.[72]

93. If a visitor had never created an account, an even smaller set of cookies was transmitted.

94. At each stage, Defendant Spring Fertility also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[73]

95. The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[74] Otherwise, the c_user cookie is cleared when the browser exits.[75]

96. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[76] If that happens, the time resets, and another 90 days begins to accrue.[77]

97. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[78] If that happens, the time resets, and another 90 days begins to accrue.[79]

98. The Facebook Tracking Pixel used both first- and third-party cookies. A first-party

[71] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[72] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[73] *Id.*

[74] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[75] *Id.*

[76] *See id.*

[77] Confirmable through developer tools.

[78] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://mbasic.facebook.com/privacy/policies/cookies/printable/#annotation-1.

[79] Also confirmable through developer tools.

Deleted:

Deleted: ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

cookie is "created by the website the user is visiting"—*i.e.*, Defendant Spring Fertility's Website.[80] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[81] The _fbp cookie was always transmitted as a first-party cookie. A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

99. Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to FIDs and corresponding Facebook profiles. Defendant Spring Fertility sent these identifiers alongside the event data.

100. Plaintiff's offsite activity report from her personal Facebook account confirms that her sensitive, confidential, and protected information was intercepted by Facebook through Defendant Spring Fertility's Website.

101. Similar disclosures occurred through the LinkedIn Insight Tag.

102. For example, Defendant Spring Fertility incorporated the LinkedIn Insight Tag on its Website, allowing Defendant LinkedIn to intercept and record "CLICK" events, which detail information about which page on Defendant Spring Fertility's Website the patient was viewing as well as the selections they were making.

103. Specifically, when booking a fertility consultation for IVF treatment, the CLICK event information shared with LinkedIn includes the terms "springfertility," "book-a-consult," "IVF." *See* Figure 15.

Deleted: ," and even information concerning a patient's sexual orientation. *See* Figures 15 and 16

[80] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[81] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

**Figure 15:**


```
Data:
"signalType": "CLICK",
"href": "",
"domAttributes": {
    "elementSemanticType": null,
    "elementValue": null,
    "elementType": null,
    "tagName": "LABEL",
    "backgroundImageSrc": null,
    "imageSrc": null,
    "imageAlt": null,
    "innerText": "Oakland",
    "elementTitle": null,
    "cursor": "pointer",
    "formAction": "/book-a-consult-location/?rel=H&int=IVF&r=CA&feid=40-
255969#gf_41",
    "isFormSubmission": false
},

Cookies:
bcookie="v=2&ced8531e-1339-4214-87b5-b277dfa75233"
li_sugr=1a9e5b2f-a312-477a-8447-051e0b430241
liap=true
lms_ads=AQE_Bcd0Y9yqMAAAAY7OTUXvuCi1gafK-
```


104. As shown in Figure 15, this interception also included the li_sugr and lms_ads cookies, which Defendant LinkedIn utilizes to identify its account holders for targeted advertising.

105. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her PII and PHI. Plaintiff was never provided with any written notice that Defendant Spring Fertility disclosed the PII or PHI of users of the Website, nor was she provided any means of opting out of such disclosures. Defendant Spring Fertility nonetheless knowingly disclosed Plaintiff's PII and PHI, and assisted Facebook and LinkedIn in unlawfully intercepting this private information for targeted advertising purposes.

106. By law, Plaintiff is entitled to privacy in her protected health information and confidential communications. Defendant deprived Plaintiff of her privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications, personally identifiable information, and protected health information; (2) disclosed and/or intercepted patients' protected health information; and (3) undertook this pattern of conduct without notifying Plaintiff and without obtaining her express

**Deleted:** Figures
**Deleted:** and 16
**Deleted:** Figures
**Deleted:** and 16, these interceptions
**Deleted:** Defendants
**Deleted:** Defendants
**Deleted:** Defendants
**Deleted:** they
**Deleted:**
**Deleted:** ¶
**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

written consent. Plaintiff did not discover that Defendant disclosed and/or intercepted her personally identifiable information and protected health information, until around April 2024.

### G. Defendant Spring Fertility's Cookie Banner Fails to Provide Notice to Consumers

107. To the extent that consumers are aware of Defendant's cookie banner, it is still grossly insufficient in notifying consumers of the types of information disclosed.

108. For example, Defendant Spring Fertility's privacy policy expressly warrants that it will not assist a third party with intercepting communications that are paired with personally identifiable information.

**Figure 16:**




109. Both Facebook's Tracking Pixel and LinkedIn's Insight Tag are commonly known as a Targeting Cookies.[84]

110. As Figure 16 demonstrates, Defendant Spring Fertility expressly warrants that the "Targeting Cookies" on its Website "***do not store directly personal information***, but are based on uniquely identifying your browser and internet device." (emphasis added).

111. Based on this express representation, Defendant's patients reasonably expect that any tracking that occurs on Defendant's Website is done in an anonymized manner. In other words, while Defendant may represent that it builds advertising profiles, it also represents that such profiles will be maintained anonymously. However, Defendant violates its own representation.

112. As courts across the country have recognized the identifiers that the Facebook Tracking Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information." The same is true of the LinkedIn Insight Tag, based on

[84] https://www.cookiepro.com/knowledge/what-are-targeting-advertising-cookies/#:~:text=Examples%20of%20targeting%20and%20advertising,them%20on%20social%20media%20platforms ("Examples of targeting and advertising cookies include social media cookies that are placed on sites to track users around the web to provide ads to them on social media platforms.").



**Deleted:** Defendants

**Deleted:** <#>**Spring Fertility Assisted Facebook and LinkedIn With Intercepting Sensitive, Confidential Information**¶
Defendant Spring Fertility assisted Defendants Facebook and LinkedIn with intercepting information that was sensitive, confidential, and personally identifiable.¶
The decision to become pregnant is sensitive and confidential. As noted by the Department of Public Health for Los Angeles County, "[w]hen you make the decision to become pregnant, you are making the decision to become parents," a decision that "is personal and private."[82]¶
Despite the sensitivity of this information, companies are extraordinarily aggressive with attempting to learn whether a woman is pregnant or has plans to become pregnant. That's because "new parents are a retailer's holy grail."[83]¶
Not only is this information confidential and sensitive, but it is also legally protected. In 2002, California enacted the Reproductive Privacy Act, codifying that "every individual possesses a fundamental right of privacy with respect to personal reproductive decisions." 2002 Cal. Legis. Serv. Ch. 385 (S.B. 1301). In 2020, California passed an amendment to the California Consumer Privacy Act, expanding the term "sensitive personal information" to include "personal information collected and analyzed concerning a consumer's health." Cal. Civ. Code § 1798.140(ae)(B). And more recently, in September 2023, California amended the Confidentiality of Medical Information Act, clarifying that the term "medical information" includes "reproductive or sexual health information," including "information from which one can infer someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity." *See* 2023 Assembly Bill No. 254(p). For more than two decades, therefore, California has made one thing abundantly clear: if information reveals reproductive decisions, it is sensitive, confidential, and protected.¶

**Deleted:** <#>The "cookie banner" on Defendant Spring Fertility's Website does not provide constructive notice of its privacy policy to consumers. The banner is located off to the right of the screen, and users are in no way required to engage with the cookie banner in order to use the Website. Effectively, the banner is non-binding browsewrap. *Price v. Carnival Corp.*, 2024 WL 221437, at *4-5 (S.D. Cal. Jan. 19, 2024) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)).¶
Moreover, to…

**Deleted:** <#>the

**Deleted:** 15

**Deleted:** 15

**Formatted:** Font: Bold, Italic

**Deleted:** , however,

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

the cookies it utilizes to identify its account holders. By assisting Facebook and LinkedIn with capturing this information anyway, Defendant Spring Fertility fails to receive consent from visitors to intercept their communications.

113. Additionally, consumers who do not interact with or click "Accept" on Defendant Spring Fertility's cookie policy still have their sensitive and confidential information disclosed to Facebook and LinkedIn.

114. Even consumers that do click "Accept" would not understand that Defendant Spring Fertility is sharing confidential information about their fertility consultation appointments, ***as this does not comply with the requirements of HIPAA and/or the CMIA for disclosing such information***, nor does it comply with the express representations in Spring Fertility's own privacy policy.

115. For example, HIPAA requires that healthcare providers, like Defendant, receive a signed express authorization from the patient prior to the sharing of their protected health information, such as appointments related to fertility treatment. Defendant never received an express authorization from Plaintiff prior to sharing her protected health information related to her treatment for fertility services. Because Plaintiff never signed an express authorization to disclose such information she had no reason to believe that Defendant would be sharing her protected health information. Such conduct is illegal under state and federal law.

**CLASS ACTION ALLEGATIONS**

116. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the class period, maintained a Facebook or LinkedIn account and booked a consultation on www.springfertility.com.

**California Class:** All natural persons in the State of California who, during the class period, maintained a Facebook or LinkedIn account and booked a consultation on www.springfertility.com.

**Deleted:** Consumers

**Formatted:** Font: Bold, Italic

**Deleted:** had a

**Deleted:** had

**Deleted:**

**Deleted:** ¶

**Formatted:** Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

117. Plaintiff reserves the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification.

118. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

119. Excluded from the Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

120. Numerosity. Members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and the records of third parties Facebook and LinkedIn.

121. Typicality. Plaintiff's claims are typical of the claims of the Classes because Plaintiff used www.springfertility.com and had her personally identifiable information and protected health information disclosed to Facebook and LinkedIn without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

122. Adequacy. Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

123. Commonality. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants have

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants' records

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

a. Whether Defendant intentionally tapped the lines of internet communication between patients and their fertility healthcare provider;

b. Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Facebook and LinkedIn;

c. Whether Facebook and LinkedIn are third-party eavesdroppers;

d. Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendant's conduct, which allowed Facebook and LinkedIn—unauthorized persons—to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f. Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Tracking Pixel and LinkedIn Insight Tag to record and communicate patients' confidential medical communications;

g. Whether Plaintiff and Class Members are entitled to damages under the ECPA, the CIPA, the CMIA, or any other relevant statute; and

h. Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

124. Superiority. Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual



Deleted: Defendants have
Deleted: Defendants'
Deleted: Defendants
Deleted: providers
Deleted: Defendant Spring Fertility's
Deleted: Defendants'
Deleted: Defendant Spring Fertility's
Deleted: Defendants
Deleted: Defendants'
Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**COUNT I**
**Violation of the Electronic Communications Privacy Act,**
**18 U.S.C. § 2511(1)**

125. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Nationwide Class against Defendant.

Deleted: Classes

Deleted: all Defendants

126. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

127. The ECPA protects both sending and the receipt of communications.

128. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

129. The transmission of Plaintiff's private and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

130. The transmission of the private and confidential information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

131. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

132. The ECPA defines an interception as the "acquisition of the contents of any wire,

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

133. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

134. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Facebook and LinkedIn used to track Plaintiff and Class Members communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's web and ad servers;

e. The plan Defendant, Facebook, and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

135. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

136. By utilizing and embedding the Facebook Tracking Pixel and LinkedIn Insight Tag on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

137. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the Facebook Tracking Pixel and LinkedIn Insight Tag, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' private and confidential information to third parties, such as Facebook and LinkedIn.

138. Defendant intercepted or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding private and confidential information, including their Facebook ID, LinkedIn account and treatment information. This confidential information was then monetized for targeted advertising purposes.

Deleted: Defendants'

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

139. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

140. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

141. Defendant intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

142. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[85]

143. Plaintiff's information that Defendant intercepted and disclosed to Facebook and LinkedIn qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42

[85] 42 U.S.C. § 1320d-6.



Deleted: Defendants

Deleted: Defendants

Deleted: Defendants

Deleted: Spring Fertility assisted

Deleted: in intercepting

Deleted: Defendants

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the Facebook Tracking Pixel and LinkedIn Insight Tag to track and utilize Plaintiff's and Class Members' private and confidential information for financial gain.

144. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

145. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Facebook Tracking Pixel or LinkedIn Insight Tag. Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

146. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

147. As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

**COUNT II**
**Violation of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10**

148. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Class against Defendant.

149. Under the California Confidentiality of Medical Information Act (the "CMIA"), California Civil Code Section 56.10, providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization. Medical information refers to:

> any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history . . . reproductive or sexual health application information, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information

Deleted: Defendants
Deleted: their
Deleted: Spring Fertiility
Deleted: Similarly, Facebook and LinkedIn intended to intercept Plaintiff's and Class Members' private and confidential information for their own financial gain.
Deleted: Defendants were
Deleted: Defendants
Deleted: Defendants
Deleted: ¶
Deleted: Spring Fertility
Formatted: Indent: Left: 1", Right: 1"
Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . .[86]

150. Plaintiff and Class Members are patients under the definition of the CMIA because Plaintiff and Class Members received "health care services from a provider of health care" and the information Spring Fertility shared to Facebook and LinkedIn was "medical information pertain[ing]" to Plaintiff and Class Members. Cal. Civ. Code § 56.05(m).

151. Defendant Spring Fertility is a "provider of health care" as defined in CMIA section 56.05(p) because it offers fertility services. Defendant Spring Fertility is also considered a "provider of health care" under the CMIA because its Website maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition. Cal. Civ. Code § 56.06(a)–(b).

152. Therefore, as a provider of health care, Defendant Spring Fertility is subject to the requirements of the CMIA and had an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

153. As set forth above, a Facebook ID is an identifier sufficient to allow identification of an individual. Along with patients' Facebook ID, Spring Fertility disclosed to Facebook several pieces of information regarding its patients' use of the Spring Fertility Website, which included, but was not limited to: treatments patients were seeking, such as booking consultations for fertility services.

154. Similarly, as set forth above, the li_sugr and lms_ads cookies allow LinkedIn to identify its individual account holders. Through these cookies, Spring Fertility disclosed to LinkedIn several pieces of information regarding its patients' of the Spring Fertility Wesbite, which included, but was not limited to: treatments patients were seeking, such as booking consultations for fertility services.

155. This patient information was derived from a provider of health care regarding

[86] Cal. Civ. Code § 56.05(j).

Formatted: English (United States)
Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

patients' medical treatment and physical condition. Accordingly, it constituted medical information pursuant to the CMIA.

156. As demonstrated above, Defendant Spring Fertility failed to obtain its patients' valid authorization for the disclosure of medical information.

157. A valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and is executed by a signature that serves no other purpose than to execute the authorization"; (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Cal. Civ. Code § 56.11(b). Accordingly, any information set forth in Defendant's Website Privacy Policy does not qualify as a valid authorization.

158. Based on the above, Defendant Spring Fertility violated the CMIA by disclosing its patients' medical information with Facebook and LinkedIn, along with information sufficient to identify each individual patient.

159. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars, attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code § 56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code § 56.36.

**COUNT III**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

160. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Class against Defendant.

161. The California Invasion of Privacy Act (the "CIPA") is codified at California Penal Code Sections 630 to 638. The CIPA begins with its statement of purpose—namely, that the purpose of the CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices

Deleted: Classes

Deleted: all Defendants

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

and techniques for the purpose of eavesdropping upon private communications . . ." Cal. Penal Code § 630.

162. A person violates California Penal Code Section 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .[87]

163. Further, a person violates section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

164. To avoid liability under section 631(a), a defendant must show it had the consent of all parties to a communication.

165. At all relevant times, Spring Fertility aided, agreed with, and conspired with Facebook and LinkedIn to track and intercept Plaintiff's and Class Members' internet communications while using www.springfertility.com to book fertility consultations. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

166. Spring Fertility, while aiding and assisting Facebook and LinkedIn's wiretapping, intended to help Facebook and LinkedIn learn some meaning of the content in the URLs and the content the visitors requested.

167. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Tracking Pixel and LinkedIn Insight Tag fall under the broad catch-all category of "any other manner":

a. The computer codes and programs Defendant, Facebook and LinkedIn used to track

[87] Cal. Penal Code § 631(a).



Formatted: Indent: Left: 1", Right: 1"
Deleted:
Deleted: ¶
Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

Plaintiff and Class Members' communications while they were navigating www.springfertility.com;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Defendant's, Facebook's and LinkedIn's web and ad servers;

e. The web and ad servers from which Defendant, Facebook and LinkedIn tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.springfertility.com;

f. The computer codes and programs used by Defendant, Facebook and LinkedIn to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.springfertility.com; and

g. The plan Defendant, Facebook and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile device to visit www.springfertility.com.

168. At all relevant times, Facebook and LinkedIn, though the Facebook Tracking Pixel and LinkedIn Insight Tag, intentionally tapped or made unauthorized connections with, the lines of internet communications between Plaintiff and Class Members and Spring Fertility's Website without the consent of all parties to the communication.

169. Facebook and LinkedIn, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Spring Fertility while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Spring Fertility.

170. Facebook and LinkedIn used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

171. By incorporating the Facebook Tracking Pixel and LinkedIn Insight Tag onto the

Deleted: its

Deleted: its

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

Website, Spring Fertility aided, agreed with, employed, and conspired with Facebook and LinkedIn to carry out the wrongful conduct alleged herein.

172. The patient communication information that Spring Fertility transmitted using the Facebook Tracking Pixel and LinkedIn Insight Tag, such as fertility consultation booking information, constituted protected health information.

173. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of $5,000 dollars per violation or three times the amount of actual damages, whichever is greater. Additionally, California Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

174. Under the CIPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT IV**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 632**

175. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Class against Defendant.

176. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

177. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

178. Plaintiff's and Class members' communications to Spring Fertility, including their sensitive personal and health information, such as their fertility treatments and sexual orientation, were confidential communications for purposes of § 632, because Plaintiff and Class Members had

Deleted: Defendants are

Deleted: Defendants are

Deleted: Defendants

Deleted: Classes

Deleted: Defendants Facebook and LinkedIn

Deleted: ". .

Deleted: Plaintiffs'

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

an objectively reasonable expectation of privacy in this data.

179. Plaintiff and Class Members expected their communications to Spring Fertility to be confined to Spring Fertility in part, because of Spring Fertility's representations that these communications would remain confidential as well as the legal protections afforded to such information. Plaintiff and Class Members did not expect third parties, and specifically Facebook and LinkedIn, to secretly eavesdrop upon or record this information and their communications.

Deleted: .

180. Facebook and LinkedIn's tracking technology, i.e., the Facebook Tracking Pixel and LinkedIn Insight Tag, are all electronic amplifying or recording devices for purposes of § 632.

181. By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Spring Fertility through this technology, Facebook and LinkedIn eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

182. At no time did Plaintiff or Class Members consent to Facebook and LinkedIn's conduct, nor could they reasonably expect that their communications to Spring Fertility would be overheard or recorded by Facebook and LinkedIn.

183. Facebook and LinkedIn utilized Plaintiff's and Class Members' sensitive personal and health information for their own purposes, including for targeted advertising.

184. Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

185. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by Facebook and LinkedIn, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

**COUNT V**
**Invasion of Privacy Under California's Constitution**

186. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Class against Defendant.

187. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

188. At all relevant times, by using the Facebook Tracking Pixel and LinkedIn Insight Tag to record and communicate patients' personal identifiers alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

189. Plaintiff and Class Members had a reasonable expectation that their communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on www.springfertility.com.

190. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable and health information.

191. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

192. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy under the California Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

Deleted: all Defendants

Deleted: Defendants

Deleted: Defendants

Deleted: Defendants

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

a. For a determination that this action is a proper class action;

b. For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

c. For an order declaring that Defendant's conduct violated the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief as pleaded or as the Court may deem proper;

j. For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff on behalf of herself and the proposed Classes demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: November 5, 2025 Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *___/s/ Sarah N. Westcot___*

Deleted: Defendants'

Deleted: Defendants

Deleted: Defendants'

Deleted: Defendants

Deleted: October 22, 2024

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"

Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

Deleted:

Deleted: ¶

Formatted: Line spacing: Exactly 12 pt, Tab stops: Not at 3" + 6"